# CONNELL CONSTRUCTION CO., INC. *v.* PLUMBERS & STEAMFITTERS LOCAL UNION NO. 100, UNITED ASSOCIATION OF JOURNEYMEN & APPRENTICES OF THE PLUMBING & PIPEFITTING INDUSTRY OF THE UNITED STATES AND CANADA, AFL–CIO

No. 73–1256. Argued November 19, 1974—Decided June 2, 1975

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and WHITE, BLACKMUN, and REHNQUIST, JJ., joined. DOUGLAS, J., filed a dissenting opinion, *post*, p. 638. STEWART, J., filed a dissenting opinion, in which DOUGLAS, BRENNAN, and MARSHALL, JJ., joined, *post*, p. 638.

*Joseph F. Canterbury, Jr.*, argued the cause and filed briefs for petitioner.

*David R. Richards* argued the cause and filed a brief for respondent.*

MR. JUSTICE POWELL delivered the opinion of the Court.

The building trades union in this case supported its efforts to organize mechanical subcontractors by picketing certain general contractors, including petitioner. The union's sole objective was to compel the general contractors to agree that in letting subcontracts for mechanical work they would deal only with firms that were

---

*Briefs of *amici curiae* urging reversal were filed by *Gerard C. Smetana, Lawrence D. Ehrlich, Jerry Kronenberg*, and *Milton Smith* for the Chamber of Commerce of the United States; by *Vincent J. Apruzzese, Francis A. Mastro*, and *William L. Keller* for the Associated General Contractors of America et al.; and by *Kenneth C. McGuiness* and *Robert E. Williams* for the Air-Conditioning and Refrigeration Institute et al.

Briefs of *amici curiae* urging affirmance were filed by *Solicitor General Bork, Peter G. Nash, John S. Irving, Patrick Hardin, Norton J. Come*, and *Linda Sher* for the National Labor Relations Board, and by *J. Albert Woll, Laurence Gold*, and *Thomas E. Harris* for the American Federation of Labor and Congress of Industrial Organizations.

parties to the union's current collective-bargaining agreement. The union disclaimed any interest in representing the general contractors' employees. In this case the picketing succeeded, and petitioner seeks to annul the resulting agreement as an illegal restraint on competition under federal and state law. The union claims immunity from federal antitrust statutes and argues that federal labor regulation pre-empts state law.

## I

Local 100 is the bargaining representative for workers in the plumbing and mechanical trades in Dallas. When this litigation began, it was party to a multiemployer bargaining agreement with the Mechanical Contractors Association of Dallas, a group of about 75 mechanical contractors. That contract contained a "most favored nation" clause, by which the union agreed that if it granted a more favorable contract to any other employer it would extend the same terms to all members of the Association.

Connell Construction Co. is a general building contractor in Dallas. It obtains jobs by competitive bidding and subcontracts all plumbing and mechanical work. Connell has followed a policy of awarding these subcontracts on the basis of competitive bids, and it has done business with both union and nonunion subcontractors. Connell's employees are represented by various building trade unions. Local 100 has never sought to represent them or to bargain with Connell on their behalf.

In November 1970, Local 100 asked Connell to agree that it would subcontract mechanical work only to firms that had a current contract with the union. It demanded that Connell sign the following agreement:

> "WHEREAS, the contractor and the union are engaged in the construction industry, and

"WHEREAS, the contractor and the union desire to make an agreement applying in the event of subcontracting in accordance with Section 8 (e) of the Labor-Management Relations Act;

"WHEREAS, it is understood that by this agreement the contractor does not grant, nor does the union seek, recognition as the collective bargaining representative of any employees of the signatory contractor; and

"WHEREAS, it is further understood that the subcontracting limitation provided herein applies only to mechanical work which the contractor does not perform with his own employees but uniformly subcontracts to other firms;

"THEREFORE, the contractor and the union mutually agree with respect to work falling within the scope of this agreement that is to be done at the site of construction, alteration, painting or repair of any building, structure, or other works, that [if] the contractor should contract or subcontract any of the aforesaid work falling within the normal trade jurisdiction of the union, said contractor shall contract or subcontract such work only to firms that are parties to an executed, current collective bargaining agreement with Local Union 100 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry."

When Connell refused to sign this agreement, Local 100 stationed a single picket at one of Connell's major construction sites. About 150 workers walked off the job, and construction halted. Connell filed suit in state court to enjoin the picketing as a violation of Texas antitrust laws. Local 100 removed the case to federal court. Connell then signed the subcontracting agreement under protest. It amended its complaint to claim that the

agreement violated §§ 1 and 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. §§ 1 and 2, and was therefore invalid. Connell sought a declaration to this effect and an injunction against any further efforts to force it to sign such an agreement.

By the time the case went to trial, Local 100 had submitted identical agreements to a number of other general contractors in Dallas. Five others had signed, and the union was waging a selective picketing campaign against those who resisted.

The District Court held that the subcontracting agreement was exempt from federal antitrust laws because it was authorized by the construction industry proviso to § 8 (e) of the National Labor Relations Act, 49 Stat. 452, as added, 73 Stat. 543, 29 U. S. C. § 158 (e). The court also held that federal labor legislation pre-empted the State's antitrust laws. 78 L. R. R. M. 3012 (ND Tex. 1971). The Court of Appeals for the Fifth Circuit affirmed, 483 F. 2d 1154 (1973), with one judge dissenting. It held that Local 100's goal of organizing nonunion subcontractors was a legitimate union interest and that its efforts toward that goal were therefore exempt from federal antitrust laws. On the second issue, it held that state law was pre-empted under *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959). We granted certiorari on Connell's petition. 416 U. S. 981 (1974). We reverse on the question of federal antitrust immunity and affirm the ruling on state law pre-emption.

## II

The basic sources of organized labor's exemption from federal antitrust laws are §§ 6 and 20 of the Clayton Act, 38 Stat. 731 and 738, 15 U. S. C. § 17 and 29 U. S. C. § 52, and the Norris-La Guardia Act, 47 Stat. 70, 71, and 73, 29 U. S. C. §§ 104, 105, and 113. These statutes declare

that labor unions are not combinations or conspiracies in restraint of trade, and exempt specific union activities, including secondary picketing and boycotts, from the operation of the antitrust laws. See *United States* v. *Hutcheson,* 312 U. S. 219 (1941). They do not exempt concerted action or agreements between unions and nonlabor parties. *Mine Workers* v. *Pennington,* 381 U. S. 657, 662 (1965). The Court has recognized, however, that a proper accommodation between the congressional policy favoring collective bargaining under the NLRA and the congressional policy favoring free competition in business markets requires that some union-employer agreements be accorded a limited nonstatutory exemption from antitrust sanctions. *Meat Cutters* v. *Jewel Tea Co.,* 381 U. S. 676 (1965).

The nonstatutory exemption has its source in the strong labor policy favoring the association of employees to eliminate competition over wages and working conditions. Union success in organizing workers and standardizing wages ultimately will affect price competition among employers, but the goals of federal labor law never could be achieved if this effect on business competition were held a violation of the antitrust laws. The Court therefore has acknowledged that labor policy requires tolerance for the lessening of business competition based on differences in wages and working conditions. See *Mine Workers* v. *Pennington, supra,* at 666; *Jewel Tea, supra,* at 692–693 (opinion of WHITE, J.). Labor policy clearly does not require, however, that a union have freedom to impose direct restraints on competition among those who employ its members. Thus, while the statutory exemption allows unions to accomplish some restraints by acting unilaterally, *e. g., Federation of Musicians* v. *Carroll,* 391 U. S. 99 (1968), the nonstatutory exemption offers no similar protection when a union and a nonlabor

party agree to restrain competition in a business market. See *Allen Bradley Co.* v. *Electrical Workers,* 325 U. S. 797, 806–811 (1945); Cox, Labor and the Antitrust Laws—A Preliminary Analysis, 104 U. Pa. L. Rev. 252 (1955); Meltzer, Labor Unions, Collective Bargaining, and the Antitrust Laws, 32 U. Chi. L. Rev. 659 (1965).

In this case Local 100 used direct restraints on the business market to support its organizing campaign. The agreements with Connell and other general contractors indiscriminately excluded nonunion subcontractors from a portion of the market, even if their competitive advantages were not derived from substandard wages and working conditions but rather from more efficient operating methods. Curtailment of competition based on efficiency is neither a goal of federal labor policy nor a necessary effect of the elimination of competition among workers. Moreover, competition based on efficiency is a positive value that the antitrust laws strive to protect.

The multiemployer bargaining agreement between Local 100 and the Association, though not challenged in this suit, is relevant in determining the effect that the agreement between Local 100 and Connell would have on the business market. The "most favored nation" clause in the multiemployer agreement promised to eliminate competition between members of the Association and any other subcontractors that Local 100 might organize. By giving members of the Association a contractual right to insist on terms as favorable as those given any competitor, it guaranteed that the union would make no agreement that would give an unaffiliated contractor a competitive advantage over members of the Association.[1] Subcontractors in the Association thus

---

[1] The primary effect of the agreement seems to have been to inhibit the union from offering any other employer a more favorable contract. When asked at trial whether another subcontractor could

stood to benefit from any extension of Local 100's organization, but the method Local 100 chose also had the effect of sheltering them from outside competition in that portion of the market covered by subcontracting agreements between general contractors and Local 100. In that portion of the market, the restriction on subcontracting would eliminate competition on all subjects covered by the multiemployer agreement, even on subjects unrelated to wages, hours, and working conditions.

Success in exacting agreements from general contractors would also give Local 100 power to control access to the market for mechanical subcontracting work. The agreements with general contractors did not simply prohibit subcontracting to any nonunion firm; they prohibited subcontracting to any firm that did not have a contract with Local 100. The union thus had complete control over subcontract work offered by general contractors that had signed these agreements. Such control could result in significant adverse effects on the market and on consumers—effects unrelated to the union's legitimate goals of organizing workers and standardizing working conditions. For example, if the union thought the interests of its members would be served by having fewer subcontractors competing for the available work,

---

get an agreement on any different terms, Local 100's business agent answered:

"No. The agreement says that no one will be given a more favorable agreement. I couldn't, if I desired, as an agent, sign an agreement other than the ones in existence between the local contractors and the Local 100.

.        .        .        .

"Q. I see. So that's—in other words, once you sign that contract with the Mechanical Contractors' Association, that sets the only type of agreement which your Union can enter into with any other mechanical contractors; is that correct, sir?

"A. That is true." Tr. 45–46.

it could refuse to sign collective-bargaining agreements with marginal firms. Cf. *Mine Workers* v. *Pennington, supra.* Or, since Local 100 has a well-defined geographical jurisdiction, it could exclude "traveling" subcontractors by refusing to deal with them. Local 100 thus might be able to create a geographical enclave for local contractors, similar to the closed market in *Allen Bradley, supra.*

This record contains no evidence that the union's goal was anything other than organizing as many subcontractors as possible.[2] This goal was legal, even though a successful organizing campaign ultimately would reduce the competition that unionized employers face from nonunion firms. But the methods the union chose are not immune from antitrust sanctions simply because the goal is legal. Here Local 100, by agreement with several contractors, made nonunion subcontractors ineligible to compete for a portion of the available work. This kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. It contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws.

There can be no argument in this case, whatever its force in other contexts, that a restraint of this magnitude

---

[2] There was no evidence that Local 100's organizing campaign was connected with any agreement with members of the multiemployer bargaining unit, and the only evidence of agreement among those subcontractors was the "most favored nation" clause in the collective-bargaining agreement. In fact, Connell has not argued the case on a theory of conspiracy between the union and unionized subcontractors. It has simply relied on the multiemployer agreement as a factor enhancing the restraint of trade implicit in the subcontracting agreement it signed.

might be entitled to an antitrust exemption if it were included in a lawful collective-bargaining agreement. Cf. *Mine Workers* v. *Pennington,* 381 U. S., at 664–665; *Jewel Tea,* 381 U. S., at 689–690 (opinion of WHITE, J.); *id.,* at 709–713, 732–733 (opinion of Goldberg, J.). In this case, Local 100 had no interest in representing Connell's employees. The federal policy favoring collective bargaining therefore can offer no shelter for the union's coercive action against Connell or its campaign to exclude nonunion firms from the subcontracting market.

## III

Local 100 nonetheless contends that the kind of agreement it obtained from Connell is explicitly allowed by the construction-industry proviso to § 8 (e) and that antitrust policy therefore must defer to the NLRA. The majority in the Court of Appeals declined to decide this issue, holding that it was subject to the "exclusive jurisdiction" of the NLRB. 483 F. 2d, at 1174. This Court has held, however, that the federal courts may decide labor law questions that emerge as collateral issues in suits brought under independent federal remedies, including the antitrust laws.[3] We conclude that § 8 (e) does not allow this type of agreement.

Local 100's argument is straightforward: the first proviso to § 8 (e) allows "an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other

---

[3] *Meat Cutters* v. *Jewel Tea Co.,* 381 U. S. 676, 684–688 (1965) (opinion of WHITE, J.); *id.,* at 710 n. 18 (opinion of Goldberg, J.); cf. *Vaca* v. *Sipes,* 386 U. S. 171, 176–188 (1967); *Smith* v. *Evening News Assn.,* 371 U. S. 195 (1962).

work." [4]   Local 100 is a labor organization, Connell is an employer in the construction industry, and the agreement covers only work "to be done at the site of construction, alteration, painting or repair of any building, structure, or other works." Therefore, Local 100 says, the agreement comes within the proviso. Connell responds by arguing that despite the unqualified language of the proviso, Congress intended only to allow subcontracting agreements within the context of a collective-bargaining relationship; that is, Congress did not intend to permit a union to approach a "stranger" contractor and obtain a binding agreement not to deal with nonunion

---

[4] Section 8 (e) provides:

"It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: *Provided,* That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: *Provided further,* That for the purposes of this subsection and subsection (b)[(4)(B)] of this section the terms 'any employer,' 'any person engaged in commerce or an industry affecting commerce,' and 'any person' when used in relation to the terms 'any other producer, processor, or manufacturer,' 'any other employer,' or 'any other person' shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: *Provided further,* That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception." 29 U. S. C. § 158 (e).

subcontractors. On its face, the proviso suggests no such limitation. This Court has held, however, that § 8 (e) must be interpreted in light of the statutory setting and the circumstances surrounding its enactment:

"It is a 'familiar rule, that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit, nor within the intention of its makers.' *Holy Trinity Church* v. *United States,* 143 U. S. 457, 459." *National Woodwork Mfrs. Assn.* v. *NLRB,* 386 U. S. 612, 619 (1967).

Section 8 (e) was part of a legislative program designed to plug technical loopholes in § 8 (b)(4)'s general prohibition of secondary activities. In § 8 (e) Congress broadly proscribed using contractual agreements to achieve the economic coercion prohibited by § 8 (b)(4). See *National Woodwork Mfrs. Assn., supra,* at 634. The provisos exempting the construction and garment industries were added by the Conference Committee in an apparent compromise between the House bill, which prohibited all "hot cargo" agreements, and the Senate bill, which prohibited them only in the trucking industry.[5] Although the garment-industry proviso was supported by detailed explanations in both Houses,[6] the construction-industry proviso was explained only by bare references to "the pattern of collec-

---

[5] See H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 39–40 (1959).

[6] 105 Cong. Rec. 17327 (1959) (remarks by Sen. Kennedy); *id.,* at 17381 (remarks by Sens. Javits and Goldwater); *id.,* at 15539 (memorandum by Reps. Thompson and Udall); *id.,* at 16590 (memorandum by Sen. Kennedy and Rep. Thompson). These debates are reproduced in 2 NLRB, Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, pp. 1377, 1385, 1576, 1708 (1959) (hereinafter Leg. Hist. of LMRDA).

tive bargaining" in the industry.[7] It seems, however, to have been adopted as a partial substitute for an attempt to overrule this Court's decision in *NLRB* v. *Denver Building & Construction Trades Council*, 341 U. S. 675 (1951).[8] Discussion of "special problems" in the construction industry, applicable to both the § 8 (e) proviso and the attempt to overrule *Denver Building Trades*, focused on the problems of picketing a single nonunion subcontractor on a multiemployer building project, and the close relationship between contractors and subcon-

---

[7] 105 Cong. Rec. 17899 (1959) (remarks by Sen. Kennedy); *id.*, at 18134 (remarks by Rep. Thompson); 2 Leg. Hist. of LMRDA 1432, 1721.

[8] President Eisenhower's message to Congress recommending labor reform legislation urged amendment of the secondary-boycott provisions to permit secondary activity "under certain circumstances, against secondary employers engaged in work at a *common construction site* with the primary employer." S. Doc. No. 10, 86th Cong., 1st Sess., 3 (1959) (emphasis added). Various bills introduced in both Houses included such provisions, see 2 Leg. Hist. of LMRDA 1912–1915, but neither the bill that passed the Senate nor the one that passed the House contained a *Denver Building Trades* provision. The Conference Committee proposed to include such an amendment to § 8 (b) (4) (B) in the Conference agreement, along with a closely linked construction-industry exemption from § 8 (e). 105 Cong. Rec. 17333 (1959) (proposed Senate resolution), 2 Leg. Hist. of LMRDA 1383. But a parliamentary obstacle killed the § 8 (b) (4) (B) amendment, and only the § 8 (e) proviso survived. See 105 Cong. Rec. 17728–17729, 17901–17903, 2 Leg. Hist. of LMRDA 1397–1398, 1434–1436. References to the proviso suggest that the Committee may have intended the § 8 (e) proviso simply to preserve the status quo under *Carpenters* v. *NLRB* (*Sand Door*), 357 U. S. 93 (1958), pending action on the *Denver Building Trades* problem in the following session. See H. R. Rep. No. 1147, *supra*, n. 5, at 39–40; 105 Cong. Rec. 17900 (1959) (report of Sen. Kennedy on Conference agreement), 2 Leg. Hist. of LMRDA 1433. Although Senator Kennedy introduced a bill to amend § 8 (b) (4), S. 2643, 86th Cong., 1st Sess. (1959), it was never reported out of committee.

tractors at the jobsite.[9]   Congress limited the construction-industry proviso to that single situation, allowing subcontracting agreements only in relation to work done on a jobsite.   In contrast to the latitude it provided in the garment-industry proviso, Congress did not afford construction unions an exemption from § 8 (b)(4)(B) or otherwise indicate that they were free to use subcontracting agreements as a broad organizational weapon.   In keeping with these limitations, the Court has interpreted the construction-industry proviso as

> "a measure designed to allow agreements pertaining to certain secondary activities on the construction site because of the close community of interests there, but to ban secondary-objective agreements concerning nonjobsite work, in which respect the construction industry is no different from any other." *National Woodwork Mfrs. Assn.,* 386 U. S., at 638–639 (footnote omitted).

Other courts have suggested that it serves an even narrower function:

> "[T]he purpose of the section 8 (e) proviso was to alleviate the frictions that may arise when union men work continuously alongside nonunion men on the same construction site." *Drivers Local 695* v. *NLRB,* 124 U. S. App. D. C. 93, 99, 361 F. 2d 547, 553 (1966).

See also *Denver Building Trades,* 341 U. S., at 692–693 (DOUGLAS, J., dissenting); *Essex County & Vicinity*

---

[9] See 105 Cong. Rec. 17881 (1959) (remarks by Sen. Morse); *id.,* at 15541 (memorandum by Reps. Thompson and Udall); *id.,* at 15551–15552 (memorandum by Sen. Elliott); *id.,* at 15852 (remarks by Rep. Goodell); see also *id.,* at 20004–20005 (post-legislative remarks by Rep. Kearns); 2 Leg. Hist. of LMRDA 1425, 1577, 1588, 1684, and 1861.

*District Council of Carpenters* v. *NLRB,* 332 F. 2d 636, 640 (CA3 1964).

Local 100 does not suggest that its subcontracting agreement is related to any of these policies. It does not claim to be protecting Connell's employees from having to work alongside nonunion men. The agreement apparently was not designed to protect Local 100's members in that regard, since it was not limited to jobsites on which they were working. Moreover, the subcontracting restriction applied only to the work Local 100's members would perform themselves and allowed free subcontracting of all other work, thus leaving open a possibility that they would be employed alongside nonunion subcontractors. Nor was Local 100 trying to organize a nonunion subcontractor on the building project it picketed. The union admits that it sought the agreement solely as a way of pressuring mechanical subcontractors in the Dallas area to recognize it as the representative of their employees.

If we agreed with Local 100 that the construction-industry proviso authorizes subcontracting agreements with "stranger" contractors, not limited to any particular jobsite, our ruling would give construction unions an almost unlimited organizational weapon.[10] The unions

---

[10] Local 100 contends, unsoundly we think, that the NLRB has decided this issue in its favor. It cites *Los Angeles Building & Construction Trades Council (B & J Investment Co.),* 214 N. L. R. B. No. 86, 87 L. R. R. M. 1424 (1974), and a memorandum from the General Counsel explaining his decision not to file unfair labor practice charges in a similar case, *Plumbers Local 100 (Hagler Construction Co.),* No. 16–CC–447 (May 1, 1974). In *B & J Investment* the Board approved, without comment, an administrative law judge's conclusion that the § 8 (e) proviso authorized a subcontracting agreement between the Council and a general contractor who used none of his own employees in the particular construction project. The agreement in question may have been a prehire con-

would be free to enlist any general contractor to bring economic pressure on nonunion subcontractors, as long as the agreement recited that it only covered work to be performed on some jobsite somewhere. The proviso's jobsite restriction then would serve only to prohibit agreements relating to subcontractors that deliver their work complete to the jobsite.

It is highly improbable that Congress intended such a result. One of the major aims of the 1959 Act was to limit "top-down" organizing campaigns, in which unions used economic weapons to force recognition from an employer regardless of the wishes of his employees.[11] Congress accomplished this goal by enacting § 8 (b)(7), which restricts primary recognitional picketing, and by further tightening § 8 (b)(4)(B), which prohibits the use of most secondary tactics in organizational campaigns. Construction unions are fully covered by these sections. The only special consideration given them in organizational campaigns is § 8 (f), which allows "prehire" agreements in the construction industry, but only under careful safeguards preserving workers' rights to decline union representation. The legislative history accompanying § 8 (f) also suggests that Congress may not

---

tract under § 8 (f), and it is not clear that the contractor argued that it was invalid for lack of a collective-bargaining relationship. The General Counsel's memorandum in *Hagler Construction* is plainly addressed to a different argument—that a subcontracting clause should be allowed only if there is a *pre-existing* collective-bargaining relationship with the general contractor or if the general contractor has employees who perform the kind of work covered by the agreement.

[11] 105 Cong. Rec. 6428–6429 (1959) (remarks of Sen. Goldwater); *id.*, at 6648–6649 (remarks of Sen. McClellan); *id.*, at 6664–6665 (remarks of Sen. Goldwater); *id.*, at 14348 (memorandum of Rep. Griffin); 2 Leg. Hist. of LMRDA 1079, 1175–1176, 1191–1192, 1523.

have intended that strikes or picketing could be used to extract prehire agreements from unwilling employers.[12]

These careful limits on the economic pressure unions may use in aid of their organizational campaigns would be undermined seriously if the proviso to § 8 (e) were construed to allow unions to seek subcontracting agreements, at large, from any general contractor vulnerable to picketing. Absent a clear indication that Congress intended to leave such a glaring loophole in its restrictions on "top-down" organizing, we are unwilling to read the construction-industry proviso as broadly as Local 100 suggests.[13] Instead, we think its authorization extends only to agreements in the context of collective-bargaining relationships and, in light of congressional references to the *Denver Building Trades* problem, possibly to common-situs relationships on particular jobsites as well.[14]

Finally, Local 100 contends that even if the subcontracting agreement is not sanctioned by the construction-

---

[12] H. R. Rep. No. 1147, *supra*, n. 5, at 42; 105 Cong. Rec. 10104 (1959) (memorandum of Sen. Goldwater); *id.*, at 18128 (remarks by Rep. Barden); 2 Leg. Hist. of LMRDA 1289, 1715. The NLRB has taken this view. *Operating Engineers Local 542*, 142 N. L. R. B. 1132 (1963), enforced, 331 F. 2d 99 (CA3), cert. denied, 379 U. S. 889 (1964).

[13] As noted above, *supra*, at 628–630, the garment-industry proviso reflects different considerations. The text of the proviso and the treatment in congressional debates and reports suggest that Congress intended to authorize garment workers' unions to continue using subcontracting agreements as an organizational weapon. See *Danielson* v. *Joint Board*, 494 F. 2d 1230 (CA2 1974) (Friendly, J.).

[14] Connell also has argued that the subcontracting agreement was subject to antitrust sanctions because the construction-industry proviso authorizes only voluntary agreements. The foundation of this argument is a contention that § 8 (b) (4) (B) forbids picketing to secure an otherwise lawful "hot cargo" agreement in the construction industry. Because we hold that the agreement in this case is outside the § 8 (e) proviso, it is unnecessary to consider this alternative contention.

industry proviso and therefore is illegal under § 8 (e), it cannot be the basis for antitrust liability because the remedies in the NLRA are exclusive. This argument is grounded in the legislative history of the 1947 Taft-Hartley amendments. Congress rejected attempts to regulate secondary activities by repealing the antitrust exemptions in the Clayton and Norris-LaGuardia Acts, and created special remedies under the labor law instead.[15] It made secondary activities unfair labor practices under § 8 (b)(4), and drafted special provisions for preliminary injunctions at the suit of the NLRB and for recovery of actual damages in the district courts. § 10 (l) of the NLRA, 49 Stat. 453, as added, 61 Stat. 149, as amended, 29 U. S. C. § 160 (l), and § 303 of the Labor Management Relations Act, 61 Stat. 158, as amended, 29 U. S. C. § 187. But whatever significance this legislative choice has for antitrust suits based on those secondary activities prohibited by § 8 (b)(4), it has no relevance to the question whether Congress meant to preclude antitrust suits based on the "hot cargo" agreements that it outlawed in 1959. There is no legislative history in the 1959 Congress suggesting that labor-law remedies for § 8 (e) violations were intended to be exclusive, or that Congress thought allowing antitrust remedies in cases like the present one would be inconsistent with the remedial scheme of the NLRA.[16]

---

[15] See H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. (House Managers' statement), 65–67 (1947); 93 Cong. Rec. 4757, 4770, 4834–4874 (1947) (debates over Sen. Ball's proposal for antitrust sanctions and Sen. Taft's compromise proposal for actual damages, which became § 303 of the NLRA).

[16] The dissenting opinion of MR. JUSTICE STEWART argues that § 303 provides the exclusive remedy for violations of § 8 (e), thereby precluding recourse to antitrust remedies. For that proposition the dissenting opinion relies upon "considerable evidence in the legislative materials." *Post*, at 650. In our view, these materials are

We therefore hold that this agreement, which is outside the context of a collective-bargaining relationship and not restricted to a particular jobsite, but which nonetheless obligates Connell to subcontract work only to firms that have a contract with Local 100, may be the basis of a federal antitrust suit because it has a potential for restraining competition in the business market in ways that would not follow naturally from elimination of competition over wages and working conditions.

## IV

Although we hold that the union's agreement with Connell is subject to the federal antitrust laws, it does not follow that state antitrust law may apply as well. The Court has held repeatedly that federal law pre-empts state remedies that interfere with federal labor policy or with specific provisions of the NLRA. *E. g., Motor Coach Employees* v. *Lockridge,* 403 U. S. 274 (1971); *Teamsters* v. *Morton,* 377 U. S. 252 (1964); *Teamsters* v. *Oliver,* 358 U. S. 283 (1959).[17] The use of state antitrust law to

unpersuasive. In the first place, Congress did not amend § 303 expressly to provide a remedy for violations of § 8 (e). See Labor-Management Reporting and Disclosure Act of 1959, §§ 704 (d), (e), 73 Stat. 544–545. The House in 1959 did reject proposals by Representatives Hiestand, Alger, and Hoffman to repeal labor's antitrust immunity. *Post,* at 650–654. Those proposals, however, were much broader than the issue in this case. The Hiestand-Alger proposal would have repealed antitrust immunity for any action in concert by two or more labor organizations. The Hoffman proposal apparently intended to repeal labor's antitrust immunity entirely. That the Congress rejected these extravagant proposals hardly furnishes proof that it intended to extend labor's antitrust immunity to include agreements with nonlabor parties, or that it thought antitrust liability under the existing statutes would be inconsistent with the NLRA. The bill introduced by Senator McClellan two years later provides even less support for that proposition. Like most bills introduced in Congress, it never reached a vote.

[17] In most cases a decision that state law is pre-empted leaves the parties with recourse only to the federal labor law, as enforced

regulate union activities in aid of organization must also be pre-empted because it creates a substantial risk of conflict with policies central to federal labor law.

In this area, the accommodation between federal labor and antitrust policy is delicate. Congress and this Court have carefully tailored the antitrust statutes to avoid conflict with the labor policy favoring lawful employee organization, not only by delineating exemptions from antitrust coverage but also by adjusting the scope of the antitrust remedies themselves. See *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469 (1940). State antitrust laws generally have not been subjected to this process of accommodation. If they take account of labor goals at all, they may represent a totally different balance between labor and antitrust policies.[18] Permitting state antitrust law to operate in this field could frustrate the basic federal policies favoring employee organization and allowing elimination of competition among wage earners, and interfere with the detailed system Congress has created for regulating organizational techniques.

by the NLRB. See *Motor Coach Employees* v. *Lockridge,* 403 U. S. 274 (1971); *San Diego Building Trades Council* v. *Garmon,* 359 U. S. 236 (1959). But in cases like this one, where there is an independent federal remedy that is consistent with the NLRA, the parties may have a choice of federal remedies. Cf. *Vaca* v. *Sipes,* 386 U. S. 171, 176–188 (1967); *Smith* v. *Evening News Assn.,* 371 U. S. 195 (1962).

[18] Texas law is a good example. Texas Rev. Civ. Stat. Ann., Arts. 5152 and 5153 (1971), declare that it is lawful for workers to associate in unions and to induce other persons to accept or reject employment. Article 5154, however, referring to the preceding articles, provides: "Nothing herein shall be construed to repeal, affect or diminish the force and effect of any statute now existing on the subject of trusts, conspiracies against trade, pools and monopolies." The Texas antitrust statutes prohibit, among other specified agreements, trusts, and monopolies, any combination of two or more persons to restrict "the free pursuit of a lawful business." Tex. Bus. & Comm. Code §§ 15.02–15.04 (1968).

Because employee organization is central to federal labor policy and regulation of organizational procedures is comprehensive, federal law does not admit the use of state antitrust law to regulate union activity that is closely related to organizational goals. Of course, other agreements between unions and nonlabor parties may yet be subject to state antitrust laws. See *Teamsters v. Oliver, supra,* at 295–297. The governing factor is the risk of conflict with the NLRA or with federal labor policy.

## V

Neither the District Court nor the Court of Appeals decided whether the agreement between Local 100 and Connell, if subject to the antitrust laws, would constitute an agreement that restrains trade within the meaning of the Sherman Act. The issue was not briefed and argued fully in this Court. Accordingly, we remand for consideration whether the agreement violated the Sherman Act.[19]

*Reversed in part, affirmed in part, and remanded.*

---

[19] In addition to seeking a declaratory judgment that the agreement with Local 100 violated the antitrust laws, Connell sought a permanent injunction against further picketing to coerce execution of the contract in litigation. Connell obtained a temporary restraining order against the picketing on January 21, 1971, and thereafter executed the contract—under protest—with Local 100 on March 28, 1971. So far as the record in this case reveals, there has been no further picketing at Connell's construction sites. Accordingly, there is no occasion for us to consider whether the Norris-LaGuardia Act forbids such an injunction where the specific agreement sought by the union is illegal, or to determine whether, within the meaning of the Norris-LaGuardia Act, there was a "labor dispute" between these parties. If the Norris-LaGuardia Act were applicable to this picketing, injunctive relief would not be available under the antitrust laws. See *United States v. Hutcheson,* 312 U. S. 219 (1941). If the agreement in question is held on remand to be

MR. JUSTICE DOUGLAS, dissenting.

While I join the opinion of MR. JUSTICE STEWART, I write to emphasize what is, for me, the determinative feature of the case. Throughout this litigation, Connell has maintained only that Local 100 coerced it into signing the subcontracting agreement. With the complaint so drawn, I have no difficulty in concluding that the union's conduct is regulated solely by the labor laws. The question of antitrust immunity would be far different, however, if it were alleged that Local 100 had conspired with mechanical subcontractors to force nonunion subcontractors from the market by entering into exclusionary agreements with general contractors like Connell. An arrangement of that character was condemned in *Allen Bradley Co.* v. *Electrical Workers,* 325 U. S. 797 (1945), which held that Congress did not intend "to immunize labor unions who aid and abet manufacturers and traders in violating the Sherman Act," *id.,* at 810. Were such a conspiracy alleged, the multiemployer bargaining agreement between Local 100 and the mechanical subcontractors would unquestionably be relevant. See *Mine Workers* v. *Pennington,* 381 U. S. 657, 673 (1965) (concurring opinion); *Meat Cutters* v. *Jewel Tea Co.,* 381 U. S. 676, 737 (1965) (dissenting opinion). But since Connell has never alleged or attempted to show any conspiracy between Local 100 and the subcontractors, I agree that Connell's remedies, if any, are provided exclusively by the labor laws.

MR. JUSTICE STEWART, with whom MR. JUSTICE DOUGLAS, MR. JUSTICE BRENNAN, and MR. JUSTICE MARSHALL join, dissenting.

As part of its effort to organize mechanical contractors in the Dallas area, the respondent Local Union No. 100

---

invalid under federal antitrust laws, we cannot anticipate that Local 100 will resume picketing to obtain or enforce an illegal agreement.

engaged in peaceful picketing to induce the petitioner Connell Construction Co., a general contractor in the building and construction industry, to agree to subcontract plumbing and mechanical work at the construction site only to firms that had signed a collective-bargaining agreement with Local 100. None of Connell's own employees were members of Local 100, and the subcontracting agreement contained the union's express disavowal of any intent to organize or represent them. The picketing at Connell's construction site was therefore secondary activity, subject to detailed and comprehensive regulation pursuant to § 8 (b)(4) of the National Labor Relations Act, as added, 61 Stat. 141, 29 U. S. C. § 158 (b)(4), and § 303 of the Labor Management Relations Act, 61 Stat. 158, as amended, 29 U. S. C. § 187. Similarly, the subcontracting agreement under which Connell agreed to cease doing business with nonunion mechanical contractors is governed by the provisions of § 8 (e) of the National Labor Relations Act, 29 U. S. C. § 158 (e). The relevant legislative history unmistakably demonstrates that in regulating secondary activity and "hot cargo" agreements in 1947 and 1959, Congress selected with great care the sanctions to be imposed if proscribed union activity should occur. In so doing, Congress rejected efforts to give private parties injured by union activity such as that engaged in by Local 100 the right to seek relief under federal antitrust laws. Accordingly, I would affirm the judgment before us.

## I

For a period of 15 years, from passage of the Norris-LaGuardia Act, 47 Stat. 70, in 1932 [1] until enactment of

---

[1] Before 1932 this Court had held that secondary strikes and boycotts were not exempt from the coverage of the antitrust laws. E. g., *Duplex Printing Press Co.* v. *Deering,* 254 U. S. 443; *Bedford*

the Labor Management Relations Act (the Taft-Hartley Act), 61 Stat. 136, in 1947, union economic pressure directed against a neutral, secondary employer was not subject to sanctions under either federal labor law or antitrust law, at least in the absence of proof that the union was coercing the secondary employer in further-ance of a conspiracy with a nonlabor group. See *United States* v. *Hutcheson,* 312 U. S. 219; *Allen Bradley Co.* v. *Electrical Workers,* 325 U. S. 797. "Congress abolished, for purposes of labor immunity, the distinction between primary activity between the 'immediate disputants' and secondary activity in which the employer disputants and the members of the union do not stand 'in the proximate relation of employer and employee . . . .'" *National Woodwork Mfrs. Assn.* v. *NLRB,* 386 U. S. 612, 623.

In *Hunt* v. *Crumboch,* 325 U. S. 821, for example, the Court found that union conduct in forcing a freight car-rier out of business was protected activity beyond the reach of the federal antitrust laws even though it involved secondary pressure that culminated in the union's com-pelling the carrier's principal patron to break its contract with the carrier and to discharge the carrier from further service. "That which Congress has recognized as law-ful," the Court noted, "this Court has no constitutional power to declare unlawful, by arguing that Congress has accorded too much power to labor organizations." *Id.,* at 825 n. 1.

Congressional concern over labor abuses of the broad immunity granted by the Norris-LaGuardia Act was one of the considerations that resulted in passage of the Taft-

*Cut Stone Co.* v. *Journeymen Stone Cutters' Assn.,* 274 U. S. 37. *Du-plex* and its progeny were overruled by Congress with passage of the Norris-LaGuardia Act, 47 Stat. 70. See *Milk Wagon Drivers' Union* v. *Lake Valley Farm Products, Inc.,* 311 U. S. 91, 100–103; *United States* v. *Hutcheson,* 312 U. S. 219, 229–231, 235–237.

Hartley Act in 1947, which, among other things, prohibited specified union secondary activity. See *National Woodwork Mfrs. Assn.* v. *NLRB, supra,* at 623. The central thrust of that statutory provision was to forbid "a union to induce employees to strike against or to refuse to handle goods for their employer when an object is to force him or another person to cease doing business with some third party." *Carpenters' Union* v. *NLRB,* 357 U. S. 93, 98.[2] In condemning "specific union conduct directed to specific objectives," *ibid.,* however, Congress deliberately chose not to subject unions engaging in prohibited secondary activity to the sanctions of the antitrust laws.

Section 12 (a)(3) of the Hartley bill, H. R. 3020, 80th Cong., 1st Sess., as initially passed by the House, defined "unlawful concerted activities" to include an "illegal boycott." 1 NLRB Legislative History of the Labor Management Relations Act, 1947, p. 205 (hereinafter Leg. Hist. of LMRA). Section 12 (c) provided that the Norris-LaGuardia Act should have no "application in any action or proceeding in a court of the United States involving any activity defined in this section as unlaw-

---

[2] The Act added § 8 (b)(4) to the National Labor Relations Act, making it an unfair labor practice for a labor organization or its agents "to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . ." 61 Stat. 141.

ful." 1 Leg. Hist. of LMRA 206–207. The Committee on Education and Labor explained in its report on the Hartley bill:

> "Illegal boycotts take many forms. . . . Sometimes they are direct restraints of trade, designed to compel people against whom they are engaged in to place their business with some other than those they are dealing with at the time . . . . Under [§ 12], these practices are called by their correct name, 'unlawful concerted activities.' It is provided that any person injured in his person, property, or business by an unlawful concerted activity affecting commerce may sue the person or persons responsible for the injury in any district court having jurisdiction of the parties and recover damages. The bill makes inapplicable in such suits the Norris-LaGuardïa Act, which heretofore has protected parties to industrial strife from the consequences of their lawlessness, no matter how violent their disputes became. Persons who engage in unlawful concerted activities are subject to losing their rights and privileges under the act." H. R. Rep. No. 245, 80th Cong., 1st Sess., 24, 44, 1 Leg. Hist. of LMRA 315, 335.

The Senate, however, refused to adopt the House's removal of antitrust immunity for prohibited secondary activity, choosing instead to make the remedies available under federal labor law exclusive. The Senate Committee on Labor and Public Welfare approved S. 1126, 80th Cong., 1st Sess., which provided that proscribed secondary conduct would be an unfair labor practice and could be enjoined on application of the National Labor Relations Board. No private remedy for an injured employer was authorized in the bill approved by the Committee. See S. Rep. No. 105, 80th Cong., 1st Sess., 7–8, 22, 1 Leg. Hist. of LMRA 413–414, 428.

Four members of the Senate Committee, although

supporting the provisions of S. 1126 as reported by the Committee, felt that a number of the provisions of the bill could be stronger. S. Rep. No. 105, *supra,* at 50, 1 Leg. Hist. of LMRA 456. In particular, the minority Senators proposed:

> "An amendment reinserting in the bill a section making secondary boycotts and jurisdictional strikes unlawful and providing for direct suits in the courts by any injured party. . . .

>     .    .    .    .    .

> "The amendment proposes that [the injured party] be entitled to file a suit for damages and obtain a temporary injunction while that suit is being heard. . . .

>     .    .    .    .    .

> "The amendment, furthermore, removes the protection of the Clayton Act from monopoly agreements to fix prices, allocate customers, restrict production, distribution, or competition, or impose restrictions or conditions on the purchase, sale, or use of material, machines, or equipment. While the existence of the union should not be a combination in restraint of trade, we see no reason why unions should not be subject in this field to the same restriction as are competing employers." S. Rep. No. 105, *supra,* at 54–55, 1 Leg. Hist. of LMRA 460–461.

Senator Ball, one of the four minority Senators on the Labor and Public Welfare Committee, did in fact offer an amendment on the Senate floor that was "designed to correct the interpretation of the Norris-LaGuardia and Clayton acts made by the Supreme Court in the Hutchinson [*sic*] case, and a number of other cases brought by former Assistant Attorney General Thurman Arnold, when he attempted to break up monopolistic practices on

the part of labor unions, sometimes acting on their own, sometimes in conspiracy with employers." 93 Cong. Rec. 4838, 2 Leg. Hist. of LMRA 1354.[3]

Although stating that he personally agreed with the changes proposed by Senator Ball, Senator Taft argued for defeat of the Ball amendment, explaining that resistance to providing a private injunctive remedy in cases of secondary boycotts was so strong that an attempt to eliminate the labor exemption from the antitrust laws would lead to the defeat of any effort to provide for a private damages remedy for injured parties. Senator Taft proposed as a substitute that private parties be given only the right to sue for actual damages. 93 Cong. Rec. 4843–4844, 2 Leg. Hist. of LMRA 1365. The Ball amendment was thereafter defeated, 93 Cong. Rec. 4847, 2 Leg. Hist. of LMRA 1369–1370, and Senator Taft introduced his proposal "to restore to people who lose something because of boycotts and jurisdictional strikes the money which they have lost." 93 Cong. Rec. 4858, 2 Leg. Hist. of LMRA 1370–1371.

In response to Senator Morse's claim that the proposal would impose virtually unlimited liability on unions, Senator Taft made plain that he was not advocating the use of antitrust sanctions against prohibited secondary activity. "Under the Sherman Act the same question of boycott damage is subject to a suit for [treble] dam-

---

[3] The amendment introduced by Senator Ball provided in part that the Clayton Act and the Norris-LaGuardia Act "shall not be applicable in respect of violations of subsection (a) [defining prohibited secondary conduct], or in respect of any contract, combination, or conspiracy, in restraint of commerce, to which a labor organization is a party, if one of the purposes of such contract, combination, or conspiracy is to fix prices, allocate customers, restrict production, distribution, or competition, or impose restrictions or conditions upon the purchase, sale or use of any material, machines, or equipment." 93 Cong. Rec. 4757 (1947).

ages and attorneys' fees. In this case we simply provide for the amount of the actual damages." 93 Cong. Rec. 4872-4873, 2 Leg. Hist. of LMRA 1398; see *Teamsters* v. *Morton*, 377 U. S. 252, 260 n. 16. Senator Taft's proposal for a private damages remedy under federal labor law was adopted by the Senate. 93 Cong. Rec. 4874-4875, 2 Leg. Hist. of LMRA 1399-1400.

In Conference, the House members agreed to eliminate the provisions of the Hartley bill which, like the Ball amendment, provided that the Norris-LaGuardia Act should have no application to private suits for unlawful secondary activity. See H. R. Conf. Rep. No. 510, 80th Cong., 1st Sess. (House Managers' statement), 58–59, 1 Leg. Hist. of LMRA 562–563. With only "clarifying changes," H. R. Conf. Rep. No. 510, *supra,* at 67, 1 Leg. Hist. of LMRA 571, the House-Senate Conferees and then both Houses of Congress agreed to regulate union secondary activity by making specified activity an unfair labor practice under § 8 (b)(4) of the National Labor Relations Act, authorizing the Board to seek injunctions against such activity, 29 U. S. C. § 160 (*l*), and providing for recovery of actual damages in a suit by a private party under Senator Taft's compromise proposal, which became § 303 of the Labor Management Relations Act, 29 U. S. C. § 187.[4] Congress in 1947 did not prohibit all

---

[4] Section 303 of the Labor Management Relations Act of 1947, 61 Stat. 158–159, provided:

"(a) It shall be unlawful, for the purposes of this section only, in an industry or activity affecting commerce, for any labor organization to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is—

"(1) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise

secondary activity by labor unions, see *Carpenters* v. *NLRB*, 357 U. S. 93; and those practices which it did outlaw were to be remedied only by seeking relief from the Board or by pursuing the newly created, exclusive federal damages remedy provided by § 303. *Teamsters* v. *Morton, supra.*

## II

Contrary to the assertion in the Court's opinion, *ante,* at 634, the deliberate congressional decision to make § 303 the exclusive private remedy for unlawful secondary activity is clearly relevant to the question of Local 100's antitrust liability in the case before us. The Court is correct, of course, in noting that § 8 (e)'s prohibition of "hot cargo" agreements was not added to the Act until 1959, and that § 303 was not then amended to cover § 8 (e) violations standing alone. But as part of the 1959 amendments designed to close "technical loopholes" perceived in the Taft-Hartley Act, Congress amended § 8 (b)(4) to make it an unfair labor practice for a labor organization to threaten or coerce a neutral employer, either directly or through his employees, where an object of the secondary pressure is to force the employer to enter into an agreement prohibited by § 8 (e).[5] At the same

---

dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person;

.  .  .  .  .

"(b) Whoever shall be injured in his business or property by reason o[f] any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 301 hereof without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit."

[5] Section 8 (b) (4) of the National Labor Relations Act, as amended by the Labor-Management Reporting and Disclosure Act of 1959,

time, Congress expanded the scope of the § 303 damages remedy to allow recovery of the actual damages sustained as a result of a union's engaging in secondary activity to force an employer to sign an agreement in violation of § 8 (e).[6]   In short, Congress has provided an employer like Connell with a fully effective private damages remedy for the allegedly unlawful union conduct involved in this case.

The essence of Connell's complaint is that it was coerced by Local 100's picketing into "conspiring" with the union by signing an agreement that limited its ability

---

73 Stat. 519, 542–543, now provides in part that it shall be an unfair labor practice for a labor organization or its agents:

"(4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—

"(A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section . . . ." 29 U. S. C. § 158 (b)(4).

[6] Section 303, as amended by the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 545, now provides:

"(a) It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158 (b)(4) of this title.

"(b) Whoever shall be injured in his business or property by reason o[f] any violation of subsection (a) of this section may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit." 29 U. S. C. § 187.

to subcontract mechanical work on a competitive basis.[7] If, as the Court today holds, the subcontracting agreement is not within the construction-industry proviso to § 8 (e), then Local 100's picketing to induce Connell to sign the agreement constituted a § 8 (b) (4) unfair labor practice, and was therefore also unlawful under § 303 (a), 29 U. S. C. § 187 (a).[8] Accordingly, Connell has the right to sue Local 100 for damages sustained as a result

---

[7] Indeed, Connell's original state-court complaint was filed before Connell had signed any agreement with Local 100. See ante, at 620. At that point it was apparent that the primary reason for the lawsuit was Connell's request for an injunction to stop the union's picketing.

[8] If, contrary to the Court's conclusion, see ante, at 626–633, Congress intended what it said in the proviso to § 8 (e), then the subcontracting agreement is valid and, under the view of the Board and those Courts of Appeals that have considered the question, Local 100's picketing to obtain the agreement would also be lawful. See, e. g., Orange Belt District Council of Painters v. NLRB, 117 U. S. App. D. C. 233, 236, 328 F. 2d 534, 537; Construction Laborers v. NLRB, 323 F. 2d 422 (CA9); Northeastern Indiana Bldg. Trades Council, 148 N. L. R. B. 854, enforcement denied on other grounds, 122 U. S. App. D. C. 220, 352 F. 2d 696. Connell would therefore have neither a remedy under § 303 nor one with the Board.

It would seem necessarily to follow that conduct specifically authorized by Congress in the National Labor Relations Act could not by itself be the basis for federal antitrust liability, unless the Court intends to return to the era when the judiciary frustrated congressional design by determining for itself "what public policy in regard to the industrial struggle demands." Duplex Printing Press Co. v. Deering, 254 U. S. 443, 485 (Brandeis, J., dissenting). See United States v. Hutcheson, 312 U. S. 219. In my view, however, even if Local 100's conduct was unlawful, Connell may not seek to invoke the sanctions of the antitrust laws. Accordingly, I find it unnecessary to decide in this case whether the subcontracting agreement entered into by Connell and Local 100 is within the ambit of the construction-industry proviso to § 8 (e), and if it is, whether it was permissible for Local 100 to utilize peaceful picketing to induce Connell to sign the agreement.

of Local 100's unlawful secondary activity pursuant to § 303 (b), 29 U. S. C. § 187 (b). Although "limited to actual, compensatory damages," *Teamsters* v. *Morton,* 377 U. S., at 260, Connell would be entitled under § 303 to recover all damages to its business that resulted from the union's coercive conduct, including any provable damage caused by Connell's inability to subcontract mechanical work to nonunion firms. Similarly, any nonunion mechanical contractor who believes his business has been harmed by Local 100's having coerced Connell into signing the subcontracting agreement is entitled to sue the union for compensatory damages; for § 303 broadly grants its damages action to "[w]hoever shall be injured in his business or property" by reason of a labor organization's engaging in a § 8 (b)(4) unfair labor practice.[9]

---

[9] If Connell and Local 100 had entered into a purely voluntary "hot cargo" agreement in violation of § 8 (e), an injured nonunion mechanical subcontractor would have no § 303 remedy because the union would not have engaged in any § 8 (b) (4) unfair labor practice. The subcontractor, however, would still be able to seek the full range of Board remedies available for a § 8 (e) unfair labor practice. Moreover, if Connell had truly agreed to limit its subcontracting without any coercion whatsoever on the part of Local 100, the affected subcontractor might well have a valid antitrust claim on the ground that Local 100 and Connell were engaged in the type of conspiracy aimed at third parties with which this Court dealt in *Allen Bradley Co.* v. *Electrical Workers,* 325 U. S. 797. At the very least, an antitrust suit by an injured subcontractor under circumstances in which Congress had failed to provide any form of private remedy for damage resulting from an illegal "hot cargo" agreement would present a very different question from the one before us—a question which it is not now necessary to answer. Cf. *Meat Cutters* v. *Jewel Tea Co.,* 381 U. S. 676, 708 n. 9 (opinion of Goldberg, J.).

On the other hand, the signatory of a purely voluntary agreement that violates § 8 (e) is fully protected from any damage that might result from the illegal "hot cargo" agreement by his ability simply to ignore the contract provision that violates § 8 (e). If the union should attempt to enforce the illicit "hot cargo" clause through any

Moreover, there is considerable evidence in the legislative materials indicating that in expanding the scope of § 303 to include a remedy for secondary pressure designed to force an employer to sign an illegal "hot cargo" clause and in restricting the remedies for violation of § 8 (e) itself to those available from the Board, Congress in 1959 made the same deliberate choice to exclude antitrust remedies as was made by the 1947 Congress.

While the House was considering labor reform legislation in the summer of 1959, specific proposals were made to apply the antitrust laws to labor unions. Representative Hiestand of California introduced a bill which "would solve many of the problems attending unbridled union power as it exists and operates in this country. My proposal is in the nature of antitrust legislation, applied to labor unions." 105 Cong. Rec. 12135, 2 NLRB Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 1507 (hereinafter Leg. Hist. of LMRDA). Representative Alger of Texas joined in cosponsoring the legislation, stating that "[u]nion monopoly power" manifests itself in "restrictive trade practices such as price fixing, restrictions on use of new processes and technological improvements, exclusion of products for the market, and so forth . . . . This bill deals directly with [this aspect] of union monopoly power." 105 Cong. Rec. 12136, 2 Leg. Hist. of LMRDA 1507. Representative Alger added the following explanation of the bill:

"Under the language of H. R. 8003 any attempt

---

form of coercion, the employer may then bring a § 303 damages suit or may file an unfair labor practice charge with the Board. See 29 U. S. C. § 158 (b)(4)(B). Since § 8 (e) provides that any prohibited agreement is "unenforcible and void," any union effort to invoke legal processes to compel the neutral employer to comply with his purely voluntary agreement would obviously be unavailing.

by a union to induce an employer or a group of employers to comply with a union demand which would result in restrictive trade practices would be unlawful, and an employer faced with such a demand could seek legal remedies to restrain the union from enforcing its demand. The consequent denial to unions of the right to fix prices or impose other artificial market limitations would not in any way interfere with normal and legitimate union functions or with their proper collective bargaining powers. They would merely be placed on an equal footing with all other groups in society as was the case during the fifty years prior to the Hutcheson decision." 105 Cong. Rec. 12137, 2 Leg. Hist. of LMRDA 1508.

The Landrum-Griffin bill, H. R. 8400, 86th Cong., 1st Sess., which, as amended, was enacted as the Labor-Management Reporting and Disclosure Act of 1959,[10] by contrast, clearly provided that the new secondary-boycott

---

[10] The legislative proceedings leading to the passage of the Labor-Management Reporting and Disclosure Act of 1959 (the Landrum-Griffin Act), 73 Stat. 519, began in January 1959 when Senator John Kennedy introduced S. 505, 86th Cong., 1st Sess. In March 1959 Senator Kennedy introduced S. 1555, incorporating 46 amendments to S. 505 made by the Committee on Labor and Public Welfare. S. 1555, with various additional amendments, was approved by the Senate on April 25, 1959, and sent to the House, where it was referred to the Committee on Education and Labor. On July 30, 1959, the House Committee favorably reported H. R. 8342, 86th Cong., 1st Sess. One week earlier H. R. 8400 and H. R. 8401, identical bills, were introduced in the House by Representatives Landrum and Griffin, respectively. The House voted on August 13, 1959, to substitute the text of H. R. 8400 for the text of the House Committee bill, and the Landrum-Griffin bill was then inserted by the House in S. 1555 in lieu of its provisions. The Conference made several substantive changes in the Landrum-Griffin bill, which was then passed by both the House and Senate and approved by the President. See generally 1 Leg. Hist. of LMRDA vii-xi.

and "hot cargo" provisions were to be enforced solely through the Board and by use of the § 303 damages remedy. See 105 Cong. Rec. 14347–14348, 2 Leg. Hist. of LMRDA 1522–1523. Recognizing this important difference, Representative Alger proposed to amend the Landrum-Griffin bill by adding, as an additional title, the antitrust provisions of H. R. 8003. 105 Cong. Rec. 15532–15533, 2 Leg. Hist. of LMRDA 1569. Representative Alger once again stated that his proposed amendment would make it unlawful for an individual local union to "[e]nter into any arrangement—voluntary or coerced—with any employer, groups of employers, or other unions which cause product boycotts, price fixing, or other types of restrictive trade practices." 105 Cong. Rec. 15533, 2 Leg. Hist. of LMRDA 1569.

Representative Griffin responded to Representative Alger's proposed amendment by observing:

"[It] serves to point out that the substitute [the Landrum-Griffin bill] is a minimum bill. It might be well at this point to mention some provisions that are not in it.

"There is no antitrust law provision in this bill.

.     .     .     .     .

"This is truly a minimum bill that a responsible Congress should pass. I believe I speak for the gentleman from Georgia [MR. LANDRUM], as well as myself when I say that if amendments are offered on the floor to add antitrust provisions or others that have been mentioned, I, for one, will oppose them. The gentleman from Georgia and I have tried to balance delicately the provisions which we believe should be in a bill at this time and which a majority of this body could support." 105 Cong. Rec. 15535, 2 Leg. Hist. of LMRDA 1571–1572.

The Alger amendment was rejected, as were additional

efforts to subject proscribed union activities to the antitrust laws and their sanctions. See, *e. g.*, 105 Cong. Rec. 15853, 2 Leg. Hist. of LMRDA 1685 (amendment offered by Rep. Hoffman). The House then adopted the Landrum-Griffin bill over protests that it "does not go far enough, that it needs more teeth, and that more teeth are going to come in the form of legislation to bring labor union activities under the antitrust laws." 105 Cong. Rec. 15858, 2 Leg. Hist. of LMRDA 1690 (remarks of Rep. Alger); see 105 Cong. Rec. 15859–15860, 2 Leg. Hist. of LMRDA 1691–1692 (adoption of the Landrum amendment to H. R. 8342, substituting in lieu of the text thereof the text of H. R. 8400 as amended).

The House-Senate Conferees made some substantive changes in the language of the amendments to § 8 (b)(4), and also added the construction- and garment-industry provisos to § 8 (e). See generally Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn. L. Rev. 257. But no change was made in the nature of the sanctions authorized for violations of either section by the House-passed Landrum-Griffin bill: An injured party could either seek relief from the Board or bring suit for damages under § 303 against unions that violate the revised secondary-boycott prohibitions. No provisions were made for exposing proscribed union secondary activity or "hot cargo" agreements to antitrust liability. See H. R. Conf. Rep. No. 1147, 86th Cong., 1st Sess., 1 Leg. Hist. of LMRDA 934.[11]

---

[11] Representative Hiestand, during House debate on the report of the Conference Committee, recommended adoption of the bill as amended by the Conference and complimented Representatives Landrum and Griffin for their efforts in guiding the bill through Congress. But in expressing concern over the fact that the legislation did not restore antitrust sanctions for union secondary activity and other anticompetitive restraints of trade, he warned: "[W]e

Indeed, two years after enactment of the Landrum-Griffin Act, Senator McClellan, whose committee hearings into abuses caused by concentrated labor power had played a major role in generating support for the 1959 labor reform legislation, together with five other Senators, introduced a bill to provide antitrust sanctions for illegal "hot cargo" agreements in the transportation industry, despite the fact that such agreements were already expressly prohibited by § 8 (e).[12] As it had in 1947 and 1959, however, Congress in 1961 rejected this effort to subject illegal union secondary conduct to the sanctions of the antitrust laws.

In sum, the legislative history of the 1947 and 1959 amendments and additions to national labor law clearly demonstrates that Congress did not intend to restore antitrust sanctions for secondary boycott activity such as that engaged in by Local 100 in this case, but rather

---

should act today with full knowledge that passage of the Landrum-Griffin bill will not solve every problem. The heart of the problem, the very heart, is the sheer power in the hands of labor union leaders due to their above-the-law status with respect to our antimonopoly laws." 105 Cong. Rec. 18132; 2 Leg. Hist. of LMRDA 1719.

[12] Section 2 (b) (2) of Senator McClellan's bill, S. 2573, 87th Cong., 1st Sess., provided that the Sherman Act be amended to read in part:

"Notwithstanding any other provision of law, every contract, agreement, or understanding, express or implied, between any labor organization and any employer engaged in the transportation of persons or property, whereby such employer undertakes to cease, or to refrain from, purchasing, using, selling, handling, transporting, or otherwise dealing in any of the products or services of any producer, processor, distributor, supplier, handler, or manufacturer which are distributed in trade or commerce in any territory of the United States or the District of Columbia, or between any such territory and another, or between any such territory or territories and any State or States or the District of Columbia or with foreign nations, or between the District of Columbia and any State or States or foreign nations, or to cease doing business with any other person shall be unlawful."

intended to subject such activity only to regulation under the National Labor Relations Act and § 303 of the Labor Management Relations Act. The judicial imposition of "independent federal remedies" not intended by Congress, no less than the application of state law to union conduct that is either protected or prohibited by federal labor law,[13] threatens "to upset the balance of power between labor and management expressed in our national labor policy." *Teamsters* v. *Morton,* 377 U. S., at 260. See *Carpenters* v. *NLRB,* 357 U. S., at 98–100; *National Woodwork Mfrs. Assn.* v. *NLRB,* 386 U. S., at 619–620. Accordingly, the judgment before us should be affirmed.

---

[13] I fully agree with the Court's conclusion, *ante,* at 635–637, that federal labor law pre-empts the state law that Connell sought to apply to Local 100's secondary activity in this case.