**McKINSTRY COMPANY,**
**Plaintiff–Appellant,**

v.

**SHEET METAL WORKERS' INTERNATIONAL ASSOCIATION, LOCAL UNION # 16, Defendant–Appellee.**

Nos. 87–3865, 87–4025.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 1988.

Decided Oct. 20, 1988.

William G. Jeffrey, Oles, Morrison, Rinker, Stanislaw & Ashbaugh, Seattle, Wash., for plaintiff-appellant.

David S. Paull, Portland, Or., for defendant-appellee.

Before HUG, FLETCHER and NELSON, Circuit Judges.

FLETCHER, Circuit Judge:

McKinstry Co. appeals the district court's grant of summary judgment in favor of the defendant union in McKinstry's action to vacate an arbitration award. We affirm.

## FACTS

Collective bargaining agreements in the sheet metal and air conditioning industry are negotiated in two phases. First, national level negotiations take place between the Sheet Metal Workers' International Association, AFL–CIO (SMWIA) and the Sheet Metal and Air Conditioning Contractors National Association, Inc. (SMACNA), a national association of employers in the industry. SMWIA and SMACNA negotiate a standard form of union agreement, which leaves blank the names of the parties. Next, the standard form is distributed to various local unions and employers for further negotiations. The standard form is a starting point for local negotiations, and may be adopted as is, with blanks filled in, or with modifications as agreed by the local parties. It is the local unions and employers who sign as parties to the agreement.

McKinstry is a Seattle-based mechanical contractor operating throughout the Pacific Northwest. Several Western Washington employers, including McKinstry, assigned their bargaining rights to the local chapter of SMACNA (SMACNA of Western Washington). SMACNA of Western Washington reached an agreement with Sheet Metal Workers' Local Union No. 99 ("Local 99"), covering several counties in Western Washington, which McKinstry signed on June 1, 1983. This collective bargaining agreement (the Agreement) was based on the standard form and specifically incorporated Articles I, II, IV, V, VIII and X without modification.

In 1985, McKinstry bid on a prime mechanical contract for the State Office Building in Portland, Oregon. McKinstry's bid was based in part on a subcontractor bid it had received from Columbia Mechanical

Co., which was the lowest bid for the sheet metal portion of the work. According to McKinstry, if it had not incorporated Columbia's sheet metal subcontract bid, McKinstry would have lost the bid for the prime mechanical contract to the next lowest prime contract bidder (which happens to have been Columbia).

McKinstry's only collective bargaining agreement covering sheet metal workers is with Local 99. Sheet Metal Workers International Association Local Union No. 16 ("Local 16") represents sheet metal workers in the Portland area. Although McKinstry has never had a labor agreement or any relationship with it, Local 16 challenged McKinstry's use of Columbia Mechanical as a violation of Article II, Sections 1 and 2 of the McKinstry/Local 99 Agreement. These sections prohibit the employer under the agreement from subcontracting with a firm that is not signatory to the Agreement. Local 16 requested a meeting under the grievance procedure provisions of the McKinstry/Local 99 Agreement, but McKinstry responded that it had no obligation to Local 16.

McKinstry next received notice from Local 16 that a Local Joint Adjustment Board in Portland was being convened, under Step Two of the grievance procedure. McKinstry sent a letter to the Joint Board and Local 16 stating its position that its Agreement with Local 99 was effective only in designated counties in the state of Washington and contesting the Local Joint Adjustment Board's jurisdiction over it.[1]

The Local Joint Adjustment Board found McKinstry to be in violation of its contract with Local 99 and awarded Local 16 approximately $19,000 in damages. McKinstry appealed to the National Joint Adjustment Board, which affirmed the Local Joint Adjustment Board's determinations but reduced the damages awarded to Local 16 from approximately $19,000 to approximately $1,900, holding the balance of the fine in abeyance to become due if McKinstry should again violate the Agreement.

McKinstry filed this action in district court, pursuant to § 301 of the National Labor Relations Act, 29 U.S.C. § 185, to vacate the arbitration award. Both parties moved for summary judgment. The district court ruled in favor of Local 16. McKinstry timely appealed.

## DISCUSSION

### I. Standard of Review and Legal Standard

■ "[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960). Where the contract contains an arbitration clause, there is a presumption of arbitrability. In other words, a grievance will be presumed arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Warrior & Gulf*, 363 U.S. at 582–83, 80 S.Ct. at 1353.

■ However, where one of the parties seeking arbitration is not a signatory to the underlying agreement, a further step is added to the inquiry. Before the presumption of arbitrability can apply, the nonsignatory party must show that the signatories intended it to derive benefits from the agreement.[2] Where such intent can be

---

1. McKinstry also pointed out that it had not undercut the local prevailing wage scale, but that it had not successfully bid the job as it did, based upon Columbia's bid, Columbia would have been the prime mechanical contractor, so that labor not covered by any agreement would have performed all of the mechanical work on the Portland job. McKinstry performed its share of the mechanical work pursuant to the applicable local plumbers and pipefitters agreement to which it is signatory.

2. This is a necessary consequence of the rule that, in general, an arbitrator is limited to deciding the dispute by application of the collective bargaining agreement, rather than by external rules of law. *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424 (1960). The burden on the nonsignatory is different from that of a signatory. The latter need only refer to a provision of the agreement; it is presumed that the provision is to bind the signatories. No such

shown, and where the arbitration clause is susceptible to the interpretation that the nonsignatory has the right to enforce these benefits,[3] then arbitration is proper.

The question of arbitrability—whether the parties are to be compelled to arbitrate—is ultimately decided by the court, not the arbitrator, on the basis of the contract entered into by the parties.[4] *AT & T Technologies v. Communications Workers*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). The district court should independently review the agreement. It should not give deference to the arbitrator's decision in this regard, but should exercise plenary review to determine whether the matter is arbitrable. *AT & T Technologies*, 475 U.S. at 649, 106 S.Ct. at 1418. Because this case presents issues of law and contract interpretation, our standard of review is also de novo. The language of the district court suggests that it may have improperly deferred to the arbitrator's decision as to arbitrability:

I cannot find that the Local Board and the National Board failed to draw their decisions favoring Local 16 from the essence of the agreement. I must therefore respect their determination that the [McKinstry/Local 99] Agreement was intended to have extraterritorial effect under the present circumstances.

Nevertheless, regardless of how the district court reached its result, its conclusion that arbitration was proper is correct.

## II. *Interpretation of the Agreement*

### A. *"Extraterritorial" Effect of the Agreement*

The district court found that the agreement had extraterritorial effects that conferred enforceable benefits on Local 16.

The court relied on the following language of Article VIII, sections 5 and 6:

SECTION 5. Except as provided in Sections 2 and 6 of this Article, the Employer agrees that journeymen sheet metal workers hired outside of the territorial jurisdiction of this Agreement shall receive the wage scale and working conditions of the local Agreement covering the territory in which such work is performed or supervised.

SECTION 6. When the Employer has any work specified in Article 1 of this Agreement to be performed outside of the area covered by this Agreement and within the area covered by another Agreement with another union affiliated with the Sheet Metal Workers' International Association, and qualified sheet metal workers are available in such area, he may send no more than two (2) sheet metal workers per job into such area to perform any work which the Employer deems necessary, both of whom shall be from the employer's home jurisdiction. All additional sheet metal workers shall come from the area in which the work is to be performed. Journeymen sheet metal workers covered by this Agreement who are sent outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Section 1 of this Article but in no case less than the established wage scale of the local Agreement covering the territory in which such work is performed or supervised plus all necessary transportation, travel time, board and expenses while employed in that area, *and the Employer shall be otherwise governed by the established working conditions of that local Agreement.*

---

presumption benefits a nonsignatory; in that case, the presumption is that the agreement does *not* apply to it. Whereas in the case of a dispute between signatories, a court will not generally look at the merits of the dispute, *id.* at 596, 80 S.Ct. at 1360, a closer inquiry is necessary in this case. The court must inquire into the merits sufficiently to determine that the grievant, by virtue of the agreement, does in fact have an arguable claim to receive a benefit from, or prevent an action on the part of, the signatory.

**3.** The parties are, of course, free to provide that the right of enforcement lies solely in a signatory party, acting on behalf of the aggrieved nonsignatory.

**4.** The parties may stipulate that the arbitrator shall decide the question of arbitrability as well as the merits of the dispute. *AT & T Technologies*, 475 U.S. at 649, 106 S.Ct. at 1418.

If employees are sent into an area where there is no local Agreement of the Sheet Metal Workers International Association covering the area then the minimum conditions of the home local union shall apply.

(Emphasis added). McKinstry argues that the underscored language applies only to workers from the Local 99 area who are sent to a job site in another area. The district court conceded that "[t]he language could certainly be read that way," but found that the individuals who negotiated the standard form agreement intended it to apply to workers from the "visited" area as well.

This language is indeed ambiguous, because it does not specify the party whose relationship with the Employer is governed by the local working conditions—Local 99 transferees, or local workers from the visited area. The immediately preceding clause refers to "Journeymen sheet metal workers covered by this Agreement who are sent outside the area covered by this Agreement." But the "otherwise governed" clause is an independent, coordinate clause with its own subject and predicate: it does not necessarily modify (in the grammatical sense) the subject of the other coordinate clause, "Journeymen sheet metal workers ..." It appears that the overall thrust of the entire Section is twofold: it refers, alternately, to the rules governing the transfer of Local 99 journeymen and the rules applicable to "[a]ll additional

sheet metal workers ... from the [visited] area."

■ Notwithstanding this ambiguity, the weight of the language in other sections of the Agreement persuades us to accept the interpretation adopted by the district court.[5] The Agreement as a whole was clearly intended to extend certain direct and indirect benefits to workers other than those represented by Local 99.

For example, Article I, Section 1 states that the Agreement covers the "conditions of employment of *all* employees of the Employer." (Emphasis added.) Article VIII, Section 5, covers the wage scale of "journeymen sheet metal workers hired outside of the territorial jurisdiction of this Agreement." Unless McKinstry contends that the term "hired" here is synonymous with "transferred"—a construction that is at odds with plain meaning and which would be redundant in conjunction with Sections 2 and 6[6]—then section 5 must refer to individuals who are not members of Local 99. This belies McKinstry's contention that the Agreement deals only with Local 99 members.

Section 6, under any interpretation, is meant for the benefit of workers from Locals other than Local 99. The ban against importing Local 99 workers to other areas is, in effect, an agreement among affiliated SMWIA locals not to compete with each other for jobs. Were McKinstry to violate Section 6 by sending more than two work-

---

**5.** The Smith and Carlough affidavits ask us to construe "established working conditions of [the visited area's] local agreement" as incorporating the grievance procedure of Article X of the McKinstry/Local 99 agreement. It might at first blush appear more logical to interpret the "local conditions" clause as incorporating the grievance procedure of the Agreement to which the visited-area *local* is a signatory. Section 6 says "the *Employer* shall be otherwise governed," and not "the *union* shall be otherwise governed." We construe this language as merely granting the visited-area local the benefit of rights it has under its local agreement, made enforceable against McKinstry by means of this provision in the Local 99 agreement. Whether these rights are enforceable by Local 16, as opposed to Local 99 exclusively, requires further analysis. *See infra,* Section B.

**6.** Article VIII, Section 2 provides:

On all works specified in Article 1 of this Agreement, fabricated and/or assembled by journeymen sheet metal workers, apprentices, and/or preapprentices within the jurisdiction of this Union, or elsewhere for erection and/or installation within the jurisdiction of any other Local Union affiliated with Sheet Metal Workers' International Association, whose established wage scale is higher than the wage scale specified in this Agreement, the higher wage scale of the job site Union shall be paid to the journeymen employed on such work in the home shop or sent to the job site.

ers into Local 16's area, it is Local 16 that would be aggrieved.

Thus, it is clear that visited-area local unions are intended to receive some benefits under the Agreement.

### B. *Proper Party to Bring Grievance*

McKinstry argues that even if the Agreement has extraterritorial application, Local 16 is not the proper party to enforce it, because Local 16 is not a party to the Agreement, or any other agreement with McKinstry.[7] Relying on *Local 13, Int'l Longshoremen's & Warehousemen's Union v. Pacific Maritime Ass'n*, 441 F.2d 1061 (9th Cir.1971), and *Local Union No. 12405, District 50, United Mine Workers v. Martin Marietta Corp.*, 328 F.2d 945, 947–49 (7th Cir.1964), McKinstry contends that only signatory parties to a collective bargaining agreement may bring grievances under the agreement. However, the cases relied on by McKinstry do not control the present situation. In *Pacific Maritime*, 441 F.2d at 1064–65, this court held that plaintiff Local 13 could not bring suit to set aside an arbitration award where it was not a party to the arbitration. Although Local 13's officers presented the grievance at the proceeding, the court found that Local 13 was merely acting as the agent of the parent union; the collective bargaining agreement's preamble named the International as the union party to the agreement, and the arbitration provisions nowhere mentioned any locals. *Id.* Significantly, Local 13 sued both the employer association *and the union*, claiming the latter had breached its duty of fair representation to the employee. The court cited *Martin Marietta*, 328 F.2d at 947–49, a factually similar case, for the proposition that the goal of industrial peace is not well served by allowing non-party locals in conflict with the parent union to sue both the employer and the union to vacate or enforce arbitration.

Here, there is no conflict between the local and the parent union, nor between the signatory union and the union attempting to use the grievance procedure. Indeed, the Agreement in this case is intended to promote cooperation and harmony among affiliated locals of SMWIA; thus, the policy of industrial peace cannot be said to favor a strict interpretation of the Agreement permitting only the parties named in the Preamble to use the grievance procedure.

The parties' intentions as set forth in the Agreement control our decision. The availability of the grievance procedure in Article X is, under the strictest possible reading, determined by the status of the grievant: it refers to "[g]rievances *of*" the Employer or Union, but not "grievances *against.*" However, there is evidence that the parties intended the provision to be interpreted reciprocally. The affidavit of Russell L. Smith, SMACNA's negotiator, refers to the provision that the employer, when doing work in a visited area, agrees to "be governed by the established working conditions of [the visited area's] local Agreement." According to the Smith affidavit, these "working conditions" are meant to include the grievance procedure set forth in Article X of the Agreement. The grievance and arbitration procedures, the Smith affidavit asserts,

> were specifically drafted and intended by the bargaining parties [SMACNA and SMWIA] to be applicable to an employer who has a grievance against a local union outside of the geographical area in which it is signatory, or in the visiting area. Similarly, a local union in an area visited by such a signatory employer may utilize the grievance procedure if the visiting employer conducts itself in a manner which gives rise to a grievance or dispute under the contract.

Identical assertions are made in the affidavit of Edward J. Carlough, SMWIA's general president and negotiator.

---

7. McKinstry also contends that the Local Joint Adjustment Board for the Local 16 area had no jurisdiction over McKinstry and thus could not hear the grievance. This contention is really a restatement of the "proper party" issue. If Local 16 can bring a grievance against McKinstry, it can do so in its own area.

The arbitration provision is thus susceptible to the interpretation that it is meant to cover grievances *against* the Employer as well as *by* the Employer. To conclude otherwise would be to concede the power of McKinstry, in a hypothetical case, to use the grievance procedures against a visited-area local otherwise subject to the terms of the Agreement—as Local 16 claims to be—while denying access to these channels to the local itself.[8] In the absence of a clear indication to the contrary, we cannot state with assurance that such a lopsided result was intended by the parties.[9] Our view is also supported by the two-tiered, national/regional bargaining structure for the industry. This structure is reflected in the Agreement's caption [10] and in Article I, Section 1, which states:

> This agreement covers the rates of pay and conditions of employment of *all employees* of the Employer *engaged in ... [all] work included in the jurisdictional claims of Sheet Metal Workers International Association.*

(Emphasis added.) This language is highly significant. By referring to *all* employees of the Employer (i.e., McKinstry) doing work outside the jurisdiction of Local 99 but within that of the parent International union, it purports to bind McKinstry wherever it may undertake contracting work. It is clear elsewhere in the agreement that the parties knew how to use language limiting the scope of a provision to "the jurisdiction of this Union," *see* Art. VII, Section 2, where such was their intention.

We conclude that Local 16 was accorded rights under this Agreement, and was accorded the ability to enforce these rights by bringing a grievance under Article X.

### III. *Enforceability of Agreement*

McKinstry next argues that, even if language in the Agreement could be construed to authorize Local 16 to bring a grievance against McKinstry, the provisions so construed would contravene public policy and thus be unenforceable.

According to McKinstry, Local 16's grievance is tantamount to an effort to force the employees of Columbia Mechanical to be governed by the Local 16 Collective Bargaining Agreement, violating the strong policy of self-determination under the National Labor Relations Act. *See Local No. 3–193, Int'l Woodworkers v. Ketchikan Pulp Co.,* 611 F.2d 1295, 1299 (9th Cir.1980); *NLRB v. Retail Clerks Local 588,* 587 F.2d 984, 986–87 (9th Cir.1978). McKinstry's argument is without merit. *Ketchikan* and *Retail Clerks* stand for the proposition that a union and an employer cannot contractually circumvent NLRA § 7 (which gives each bargaining unit the right to choose its own representation) by means of a contract clause which purports to place newly established bargaining units under the union's control. Here, the situation is different, in part due to the nature of the construction industry. Local 16 is not attempting to force a new bargaining unit to come under its representation, but rather to bar non-union workers from the Portland Project job site. A job site is not necessarily a bargaining unit.

It is true that the Agreement in this case would have the effect of pressuring Columbia Mechanical workers to join Local 16. The appropriate concern is not the accretion of bargaining units, but rather the danger of secondary boycotts. The Agreement essentially prohibits McKinstry from subcontracting with a neutral employer—Columbia Mechanical—which is not a signa-

---

8. Article X, Section 3 contemplates that visiting contractors can have grievances resolved by a Local Joint Adjustment Board even though the contractor is not a party to the local Agreement in the visited area. This is not directly applicable to the McKinstry/Local 16 situation, but it supports our conclusion that the Agreement is intended to provide a grievance procedure equally applicable to nonsignatories.

9. Alternatively, the local conditions clause could be interpreted so as to incorporate *Local 16's* grievance procedure into the Agreement. (As a practical matter the effect is the same, because Local 16 uses the standard SMWIA Article X procedure.)

10. It reads: "Standard Form of Union Agreement: Sheet Metal, Roofing, Ventilating and Air Conditioning Contracting Divisions of the Construction Industry."

tory to a SMWIA agreement. The effect of such secondary boycotts is to place "top down" pressure (i.e., from the union through the employer) to organize non-union employees. *Woelke & Romero Framing v. NLRB*, 456 U.S. 645, 663, 102 S.Ct. 2071, 2081, 72 L.Ed.2d 398 (1982). While secondary boycotts are prohibited by § 8(e) of the Labor and Management Reporting Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 158(e), the construction industry is exempted from this rule by the so-called "construction industry proviso" within § 8(e). *Woelke & Romero*, 456 U.S. at 648, 102 S.Ct. at 2074. The "union signatory subcontracting clause" of Article II, Section I of the Agreement—forbidding the Employer from subcontracting any work to nonsignatory employers—is an accepted and enforceable provision. *Woelke & Romero*, 456 U.S. at 648, 102 S.Ct. at 2074.

In the case before us, however, an additional wrinkle is added to the typical "subcontracting clause." The cases dealing with the propriety of subcontracting clauses have considered these clauses as applied to job sites within the geographical area specifically covered by the agreement. Here, a "sister" local of the signatory local union seeks to enforce the subcontracting clause outside the geographical area covered by the agreement.

Although we are aware of no authority dealing specifically with this situation, we note that the position asserted by Local 16 in the underlying dispute is not alien or new to construction industry contracts. Collective bargaining patterns in the construction industry typically share the same overall pattern as that used to arrive at the agreement in this case: a standard form agreement or master agreement is reached by bargaining representatives at the national level, with modifications—typically having to do with wage schedules—made between local unions and regional contractors' associations. *See* Lunden, "Subcontracting Clauses in Major Contracts—Part II," 84 Monthly Lab.Rev. 715, 723 (1961); Pierson, "Building Trades Bargaining Plan in Southern California," 70 Monthly Lab. Rev. 14, 14 (1950). In enacting the construction industry proviso, Congress preserved broad subcontracting agreements in the industry. *Woelke & Romero*, 456 U.S. at 654–60, 102 S.Ct. at 2077–80. Since agreements of the type at issue here appear to have been common in the construction industry and contemplated by the drafters of § 8(e), we cannot say that the agreement before us contravenes public policy. *See Woelke & Romero*, 456 U.S. at 654, 660, 662–64, 102 S.Ct. at 2077, 2080, 2081–82. Moreover, as we have noted above, our interpretation of the SMAC-NA/SMWIA agreement, giving extra-territorial application to the subcontracting clause, fosters the goals of the labor relations laws by promoting comity among locals in the same trade and by reducing fragmentation in construction industry collective bargaining. *See* Hartman & Franke, "The Changing Bargaining Structure in Construction," 33 Ind. & Labor Relations Rev. 170, 171–73, 183–84 (1980).

Our conclusion does not conflict with *Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 627, 95 S.Ct. 1830, 1837, 44 L.Ed.2d 418 (1975), decided before *Woelke & Romero*. In *Connell*, the Supreme Court invalidated a subcontracting agreement that arose out of secondary picketing of a general contractor by a union that had no collective bargaining agreement with the contractor. The Court concluded that subcontracting clauses were only permissible in the context of a collective bargaining relationship. *Id.* at 633, 95 S.Ct. at 1840; *see Woelke & Romero*, 456 U.S. at 653 n. 8, 102 S.Ct. at 2077 n. 8; *Pacific Northwest Chapter of Associated Builders & Contractors v. NLRB*, 654 F.2d 1301, 1315 (9th Cir.1981) (en banc), *aff'd in pertinent part sub nom. Woelke & Romero, supra.* Here, McKinstry contends that Local 16 is attempting to enforce a subcontracting agreement against McKinstry even though no collective bargaining relationship exists between them.

McKinstry's reliance on *Connell* is misplaced. We can assume, arguendo, that McKinstry has no collective bargaining re-

lationship with Local 16.[11] However, it is not Local 16 which has imposed the subcontracting clause on McKinstry; rather, the subcontracting clause is found in McKinstry's agreement with Local 99. Whereas the local union in *Connell* obtained a no-subcontracting agreement with Connell even though the local "had never sought to represent [Connell's employees] or to bargain with Connell on their behalf," here Local 99 obtained a subcontracting clause that redounds to the benefit of Local 16, a third-party. Collective bargaining agreements have been known to create third-party beneficiaries. *See, e.g., Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 370–71, 104 S.Ct. 1844, 1848–49, 80 L.Ed.2d 366 (1984); *Alabama Power Co. v. Local Union No. 1333, Laborers' Int'l Union of North America*, 734 F.2d 1464, 1467 & n. 1 (11th Cir.1984). Nothing in *Connell* prohibits collective bargaining agreements from creating subcontracting clause rights in third-party locals.

### IV. *Attorneys' Fees*

 Article X, Section 6 of the agreement states:

> SECTION 6. In the event of non-compliance within thirty (30) calendar days following the mailing of a decision of a Local Joint Adjustment Board, Panel or the National Joint Adjustment Board, a local party may enforce the award by any legal means including proceedings in a court of competent jurisdiction in accord with applicable state and federal law. The prevailing party in litigation to enforce an award shall be entitled to its costs and attorney's fees in addition to such other relief as is directed by the courts.

This provision does not specify that only "the Union" (i.e. Local 99) may get attorneys fees, but authorizes fee awards to a prevailing "local party." The district court was correct in its determination that Local 16 is entitled to fees under the contract. *See e.g., Fleischmann Distilling Corp. v.*

---

**11.** In fact, certain elements of a collective bargaining relationship are present. Local 16 is a "sister" local to Local 99, the union with which McKinstry, through its regional multiemployer association, negotiated the Agreement. Moreover, the two locals rely on the same standard form agreement in collective bargaining.

---

*Maier Brewing Co.*, 386 U.S. 714, 717, 87 S.Ct. 1404, 1406, 18 L.Ed.2d 475 (1967).

### CONCLUSION

We conclude that the McKinstry/Local 99 Agreement accorded subcontracting clause rights to sister locals, such as Local 16, in visited areas; and that aggrieved sister locals can avail themselves of the grievance and arbitration procedures set forth in the Agreement. The Agreement is not against public policy. The award of attorneys fees was proper.

AFFIRMED.