IRON WORKERS DISTRICT COUNCIL OF the PACIFIC NORTHWEST; Local Union No. 29, of the International Association of Bridge, Structural and Ornamental Iron Workers, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

IRON WORKERS DISTRICT COUNCIL OF the PACIFIC NORTHWEST; Local Union No. 29, of the International Association of Bridge, Structural and Ornamental Iron Workers, Respondents.

Nos. 89–70283, 89–70313.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 5, 1990.

Decided Sept. 13, 1990.

Victor J. Van Bourg and Paul D. Supton, Van Bourg, Weinberg, Roger & Rosenfeld, San Francisco, Cal., for petitioners/cross-respondents.

Frederick C. Havard and John Fawley, N.L.R.B., Washington, D.C., for respondent/cross-petitioner.

Lewis K. Scott, Spears, Lubersky, Bledsoe, Anderson, Young & Hilliard, Portland, Or., for intervenor.

Before HALL, THOMPSON and LEAVY, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

The petitioners have filed a petition for review, and the respondent has filed a cross-application for enforcement, of an Order of the National Labor Relations Board ("Board"). The Order was entered pursuant to the Board's decision that the petitioners, Iron Workers District Council of the Pacific Northwest ("district council") and Local Union No. 29 of the International Association of Bridge, Structural and Ornamental Iron Workers ("Local 29"), committed unfair labor practices in attempting to get the charging party, Hoffman Construction Company of Oregon ("Hoffman"), to agree to a subcontracting agreement. The subcontracting agreement would have required Hoffman, a general contractor, to hire only subcontractors who had a contract with the union. Hoffman was granted leave to intervene. We have jurisdiction under 29 U.S.C. § 160(e), (f). We affirm the decision and enforce the Order.

## FACTS

Between July 1, 1983 and June 30, 1986 the Oregon–Columbia Chapter, Associated General Contractors of America, Inc., an employer's group of general contractors, and Local 29 which is affiliated with the district council, were parties to a collective-bargaining agreement. On May 1, 1985 Hoffman and Local 29 entered into a compliance agreement by which Hoffman agreed to be bound by most terms and conditions of the collective-bargaining agreement. Wayne Thomas, Hoffman's employee relations manager, represented Hoffman during negotiations leading to this compliance agreement.

In mid–1985 Hoffman decided it would no longer employ iron workers and other skilled tradesmen directly. It decided instead to become a construction manager and subcontract to other entities various jobs, including iron work, which for the most part Hoffman employees had theretofore performed. On February 24, 1986 Thomas, on behalf of Hoffman, informed Local 29 by letter that Hoffman would not renew its labor agreement with the union. The agreement was to expire on June 30, 1986.

On February 25, 1986 LeRoy Worley, president of the district council, responded to Thomas' letter. Worley confirmed termination of the agreement effective June 30, 1986, and stated he would contact Thomas regarding a proposed future agreement. On April 2, 1986 Thomas sent another letter to Local 29 reiterating Hoffman's intent to end all labor agreements by July 1, 1986:

> It is our present intention and our proposal that after July 1, 1986, we no longer employ any employees performing work of the kind covered by our labor contract with you.
>
> We also propose that effective July 1, 1986, we no longer have any restraints concerning those to whom we subcontract work. It is our strong belief that we must be able to subcontract on a competitive basis, without regard to whether a subcontractor has an agreement with you.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> Under our proposal it would appear to be inappropriate to have any agreement with you after July 1, 1986, since we do not intend to be employing your members after that date; in other words, it is proposed that by July 1, 1986, we will have no employees and there will be no employees in the future. However, we are interested in any ideas or proposals you may have with respect to these matters and would welcome your full input before any final decisions are made.

In early June, Local 29 and the district council, acting through Worley, sent Thomas an application for membership in the Northwest Iron Workers Employers Association, Inc. Worley included a copy of the current labor agreement between Northwest Iron Workers Employers Association, Inc. and the district council. This form of agreement included a subcontracting clause. The clause required Hoffman to do business only with subcontractors who had a contract with the union. On June 19,

1986 Daniel Kealy, Local 29's business manager, sent Hoffman a new, independent short form agreement which contained a similar subcontracting clause. On June 23, 1986 Kealy told Thomas that he only really wanted to tie Hoffman to the subcontracting clause—Kealy did not care whether Hoffman discontinued direct hiring of iron workers. On June 24, 1986 Thomas once again informed Worley that Hoffman did not intend "to employ any employees performing work of the kind covered by [its] expiring labor contract."

While Hoffman, Local 29, and the district council were exchanging letters and communicating as set forth above, Hoffman was performing work at three job sites in Portland, Oregon: Performing Arts Center, One Financial Center, and the Good Samaritan Hospital. When Hoffman failed to sign a labor agreement that included the proffered subcontracting clause, picketing began at these job sites on July 1, 1986.

Hoffman filed unfair labor charges with the Board. The Board sought an injunction in the district court to stop the picketing. The district court found reasonable cause to believe that Local 29 and the district council were violating sections 8(b)(4)(A) and (B) of the Act by picketing the job sites. The district court granted a temporary injunction on July 17, 1989 pursuant to section 10(1) of the Act, 29 U.S.C. § 160(1). This injunction precluded picketing pending final resolution of the underlying unfair labor practice charges which were then before the Board.[1]

The picketing stopped, but then resumed in August 1986. Both Local 29 and the district council were later held in civil contempt for violating the temporary injunction. We affirmed the district court's finding of contempt and imposition of sanctions

in *NLRB v. Ironworkers Dist. Council,* 884 F.2d 1395 (9th Cir.1989) (unpublished disposition). In that decision we noted that the only question then before us was the validity of the district court's contempt order, and whether Local 29 and the district council had violated that order. The contempt order was based on the district court's temporary injunction, for which the district court had only to find "reasonable cause to believe" that the conduct enjoined violated sections 8(b)(4)(A) and (B) of the Act. Review of whether the picketing actually violated these sections of the Act was expressly left for future consideration by this court in any petition for review that might be filed following the decision by the NLRB in the unfair labor practice case. That decision was made and the Board issued its order. It is that decision and order which are now before us.

## DISCUSSION

### A. *Section 8(b)(4)(A) Violation*

[1] Section 8(b)(4)(A) of the Act makes it unlawful for a union to coerce an employer to enter into an agreement prohibited by section 8(e). 29 U.S.C. § 158(b)(4)(A).[2] Section 8(e) makes it an unfair labor practice for an employer and a union to enter into an agreement whereby the employer agrees to "refrain from ... doing business with any other person." Section 8(e) provides in part:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other em-

---

1. We affirmed the validity of this temporary injunction in *Nelson v. Ironworkers Dist. Council,* 831 F.2d 303 (9th Cir.1987) (unpublished disposition).

2. Section 8(b)(4)(A) provides in part:
   (b) It shall be an unfair labor practice for a labor organization or its agents—

   . . . . .

   (4)(i) to engage in ... a strike ... or (ii) to threaten, coerce, or restrain any person en-

gaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
   (A) forcing or requiring any employer or self-employed person to join any labor ... organization or to enter into any agreement which is prohibited by subsection (e) of this section

   . . . .

29 U.S.C. § 158(b)(4)(A).

ployer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void. . . .

. . . .

29 U.S.C. § 158(e).

Local 29 and the district council concede that the subcontracting clause to which they sought to tie Hoffman is prohibited by the general proscription of section 8(e). However, they contend that the picketing and picketing-related activity, by which an attempt was made to get Hoffman to accept the clause, falls within the exception to section 8(e) known as the construction industry proviso. This proviso states:

> . . . *Provided*, That nothing in this sub-section [ (e) ] shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work. . . .

29 U.S.C. § 158(e).

■ Facially, the proviso allows unions and employers in the construction industry to make agreements which the general proscription of section 8(e) condemns. *See National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 637–39, 87 S.Ct. 1250, 1264–66, 18 L.Ed.2d 357 (1967). The Supreme Court, however, has interpreted the proviso narrowly. The proviso only applies to agreements which are "sought or obtained in the context of a collective-bargaining relationship." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 653, 102 S.Ct. 2071, 2076, 72 L.Ed.2d 398 (1982); *see Connell Constr. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 633, 95 S.Ct. 1830, 1840, 44 L.Ed.2d 418 (1975); *McKinstry Co. v. Sheet Metal Workers' Int'l Ass'n, Local Union # 16*, 859 F.2d 1382, 1389 (9th Cir.1988).

The issue then is whether a collective-bargaining relationship existed between the union and Hoffman at the time the picketing and picketing-related activities oc-

curred. Local 29 and the district council argue that the collective-bargaining relationship continued to exist into July and August 1986 because: (1) Hoffman's announcement in February 1986 of its intention no longer to hire iron workers as its employees was insufficient to terminate the collective-bargaining relationship which then existed; (2) Thomas' representation that he would discuss the proposed labor agreements with Hoffman's management indicated that negotiations were continuing; and (3) even if the collective-bargaining *agreement* terminated June 30, 1986, the long history of past agreements between the parties suggests that the collective-bargaining *relationship* had not been terminated.

■ Whether a collective-bargaining relationship existed after June 30, 1986 is a factual question. *Altemose Constr. Co. v. Building & Constr. Trades Council*, 751 F.2d 653, 662 (3d Cir.1985) ("there are material fact issues as to the existence of a collective bargaining relationship"), *cert. denied*, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986). The Board's resolution of this factual question will be upheld on appeal if substantial evidence supports the Board's findings of fact and if the Board has correctly applied the law. *NLRB v. Howard Elec. Co.*, 873 F.2d 1287, 1290 (9th Cir.1989). We must consider the record as a whole, weighing evidence supporting and detracting from the decision. *NLRB v. International Bhd. of Elec. Workers, Local 77*, 895 F.2d 1570, 1573 (9th Cir.1990). "Under the substantial evidence standard of review, the court of appeals must affirm where there is 'such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence.'" *Id.* (quoting *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1371 (9th Cir.1987)).

Substantial evidence supports the Board's finding that the collective-bargaining relationship between Hoffman and the union terminated prior to the picketing and picketing-related activities in July and August 1986. On February 24, 1986 Hoffman

stated that it would no longer directly hire union iron workers. Hoffman told Local 29 that it would not renew the labor agreement upon its expiration on June 30, 1986. The district council, in a reply letter, confirmed termination of the collective-bargaining agreement effective June 30, 1986. In an April 2, 1986 letter, Hoffman told Local 29 "[i]t would appear to be inappropriate to have any agreement with you after July 1, 1986, since we don't intend to be employing your members after that date." Hoffman's expression of intention to terminate its collective bargaining relationship with the union, although perhaps not expressed in the clearest of terms, was not misunderstood by the union. To the contrary, the evidence shows that termination of the relationship was a circumstance to which the union acquiesced, albeit reluctantly. What the union really wanted from Hoffman was a subcontracting clause once the collective bargaining relationship ended. At a June 23, 1986 meeting with Hoffman's representative Thomas, Local 29 business manager Kealy stated: "Look, I don't care if Hoffman ever hires any iron workers or not. I just want to tie Hoffman to the subcontract clause." And as of July 1, 1986, the union did not represent any unit of Hoffman employees.

We conclude the Board did not err in determining that during July and August 1986, the subcontracting clause was not sought or obtained within the context of a collective-bargaining relationship between Hoffman and the union. Therefore, the proviso of section 8(e) is inapplicable. The July and August 1986 picketing and picketing-related activity violated section 8(b)(4)(A) of the Act.

B. *Section 8(b)(4)(B) Violation*

■■■ Section 8(b)(4)(B) of the Act prohibits secondary boycott activities. *Chip-*

*man Freight Servs., Inc. v. NLRB*, 843 F.2d 1224, 1227 (9th Cir.), *cert. denied*, 488 U.S. 848, 109 S.Ct. 128, 102 L.Ed.2d 101 (1988).[3] Secondary boycott activities are those which are calculated to involve neutral employers and employees in the union's dispute with the primary employer. *Id.* at 1226. The picketing and picketing-related activities in this case occurred at common job sites where the primary employer against whom the picketing was directed, as well as other neutral employers and employees, were working. A union may picket a primary employer "at a [job] situs under the control of the secondary employer, as long as the picketing is primary in nature." *NLRB v. Ironworkers Local 433*, 850 F.2d 551, 554 (9th Cir.1988).

■■■ *Sailors' Union of the Pac. (Moore Dry Dock Co.)*, 92 N.L.R.B. 547 (1950) established a four-part test to determine whether picketing at a common situs is primary or secondary: (a) whether the "picketing is strictly limited to times when the *situs* of dispute is located on the secondary employer's premises"; (b) whether "the primary employer is engaged in its normal business at the *situs*"; (c) whether the picketing takes place reasonably close to the *situs*; and (d) "whether the picketing discloses clearly that the dispute is with the primary employer." *Id.* at 549 (footnotes omitted).

Local 29 and the district council concede that the picketing and picketing-related conduct that occurred during July 1986 was secondary in nature and therefore violated section 8(b)(4)(B). They argue, however, that the picketing-related conduct that occurred during August 1986 was lawful. The administrative law judge ("ALJ") and the Board concluded that the August 1986 conduct was unlawful because it violated a *Moore Dry Dock* guideline, namely, a failure to confine the picketing-related activity

---

**3.** Section 8(b)(4)(B) of the Act provides that it shall be an unfair labor practice for a union or its agents:

(i) ... to induce or encourage any individual employed by any person engaged in commerce ... to engage in, a strike or a refusal in the course of his employment to ... perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce ... where in either case an object thereof is—

(B) forcing or requiring any person to cease ... doing business with any other person....

29 U.S.C. § 158(b)(4)(B).

to the primary gates, when other gates for neutral employers and employees had been established.

We have stated that:

the *Moore Dry Dock* rule is only an evidentiary tool. Thus, "the inference of primary activity raised by compliance with the *Moore Dry Dock* standards may be dispelled if the totality of the circumstances [indicates] the union's" objective is secondary.

*International Ass'n of Bridge, Structural and Ornamental Iron Workers, Local No. 433 v. NLRB*, 598 F.2d 1154, 1157 (9th Cir.1979) (quoting *Carpenters Dist. Council v. NLRB*, 560 F.2d 1015, 1018 (10th Cir.1977)) (citations omitted).

In the present case, the ALJ and the Board found that the union had *not* complied with the *Moore Dry Dock* standards. Thus, if there is substantial evidence to support this finding, there is no inference of primary activity. To the contrary, the inference is that the activity was secondary. However, because the *Moore Dry Dock* rule is an evidentiary tool, to be consistent with *International Ass'n of Iron Workers, Local No. 433*, 598 F.2d at 1157, this inference of secondary activity, like the inference of primary activity, may be dispelled if the totality of the circumstances indicates that the union's objective was not secondary.

The evidence before the ALJ included job diary entries, photographs and the uncontradicted testimony of Hoffman employees who were superintendents on each of the three job sites. It was established that on August 18, 1986 at the Performing Arts Center job site there were ten-to-fifteen iron workers standing around near the neutral gate, while picketing was going on at the Hoffman gate. Craft employees generally parked directly east of the neutral gate and to enter the project they had to walk through this congregation of iron workers. Also on August 18, 1986 at the One Financial Center job site, a crowd of men was milling around in the vicinity of an intersection at the corner of the construction site near the neutral gate. Directly in front of the neutral gate were two men wearing Local 29 insignia, hats and union buttons. These men were observed talking to craft employees who approached the gate. Thereafter, the craft employees left the area. On the same day, Hoffman's superintendent heard Kealy (Local 29's business manager) tell an employee of a neutral subcontractor that the strike was sanctioned by Columbia Pacific Building and Construction Trades Council.

At the Good Samaritan Hospital job site, various subcontractors failed to work during the period of August 19–22, 1986 due to picketing and picketing-related activities. On August 22, 1986 no craft workers worked at the Good Samaritan Hospital job site. The ALJ found this "total shutdown was due to information being circulated that the strike had been sanctioned by the Columbia Building and Construction Trades Council." The Hoffman superintendent at the Good Samaritan Hospital job site testified that on August 19 or 20, 1986, he heard a person at the neutral gate tell neutral employees, "if any of you guys would like to talk to our business agent [Kealy of Local 29] he's at the corner now."

There is "an inference that ... failure of ... [neutral] subcontractors to appear and continue their work [is] due to [the union's] picketing at the neutral gate." *Carpenters Union Local No. 1622*, 262 N.L.R.B. 1211 (1982), *enforced*, 786 F.2d 903 (9th Cir.1986) (per curiam). A union agent's statement to neutral employees that another union authorized the picketing is reasonably understood to be a signal or request for the neutral employees to stop work against their own employer. *See Great Falls Bldg. & Constr. Trades Council, (Purvis–Fedco, Inc.)*, 154 N.L.R.B. 1637, 1644 (1965).

The evidence before the Board supports the inference that the object of the picketing-related activities in August 1986 was secondary. We conclude that there is substantial evidence to support the Board's finding that this conduct violated section 8(b)(4)(B) of the Act.

## C. *Joint Liability of District Council*

A union will not be held accountable for the conduct of others unless the union "instigated, authorized, solicited, ratified, condoned or adopted" the statements and unlawful conduct. *NLRB v. Miramar of Cal., Inc.,* 601 F.2d 422, 425 (9th Cir.1979). The district council argues that the Board erred in finding it jointly liable along with Local 29 for violations of sections 8(b)(4)(A) and (B) of the Act. The district council contends that it only assisted Local 29 in trying to secure a contract with Hoffman, and that it did this before any picketing occurred. Once picketing began, it claims Hoffman's representatives were the ones who sought the district council's assistance.

The Board's finding that the district council "was responsible for, and thereby engaged in, the picketing ... must be upheld if supported by substantial evidence." *NLRB v. Omaha Bldg. & Constr. Trades Council,* 856 F.2d 47, 50 (8th Cir.1988) (citation omitted). Substantial evidence supports the Board's finding.

On February 24, 1986 when Hoffman notified Local 29 of its intention to let the labor agreement terminate on June 30, 1986, it was Worley, on behalf of the district council, who responded. On June 9, 1986 Worley met with Hoffman management, apparently with authority to speak for Local 29. Prior to this meeting Worley sent an application to the Hoffman management for membership in the Northwest Iron Workers and Employers Association together with a new master labor agreement that would bind Hoffman by contract to Local 29. At the June 9 meeting, Worley told the Hoffman representative that "*we* want to get you on board." He also stated, "*we* can't have large general contractors like Hoffman sub non-union," and he added that he was prepared to take this "all the way." On August 20, 1986 a Hoffman representative told Worley that since Local 29 and the district council would not permit changes in the labor agreement, he did not see any point in meeting to negotiate. Worley responded that if Hoffman wanted its jobs to remain shut down for ten days while he was on vacation, that was up to Hoffman. Worley also told a Hoffman representative, James Hutchison, that the only way to resolve Hoffman's problems was for Hoffman to sign the proposed labor agreement that included the subcontracting clause.

We conclude that the Board did not err in holding the district council jointly liable for the violations of sections 8(b)(4)(A) and (B) of the Act.

## CONCLUSION

We affirm the Board's decision and grant its application for enforcement of its order requiring the unions to cease and desist from violating sections 8(b)(4)(A) and (B) of the Act.

Decision AFFIRMED and order ENFORCED.