**INTERNATIONAL UNION OF BRICK-LAYERS AND ALLIED CRAFT-WORKERS, LOCAL 5,** Appellee

v.

**BANTA TILE & MARBLE CO., INC.,** Appellant.

No. 08–4135.

United States Court of Appeals, Third Circuit.

Argued July 15, 2009.

Filed: Sept. 14, 2009.

Thomas R. Davies (Argued), Harmon & Davies, Lancaster, PA, for Appellant.

Charles W. Johnston (Argued), Camp Hill, PA, for Appellee.

Before: RENDELL, FUENTES, and ROTH, Circuit Judges.

OPINION

FUENTES, Circuit Judge:

Banta Tile and Marble Company, Inc. ("Banta") appeals from the District Court's grant of summary judgment in favor of International Union of Bricklayers and Allied Craftworkers, Local 5 ("Local 5"). Banta alleges that the District Court erred when it held that Banta was required to arbitrate a grievance filed by Local 5 even though Banta was no longer a party to any agreement with Local 5. For the reasons stated below, we will affirm.[1]

### I. Facts and Procedural History

Because we write exclusively for the parties, we only discuss the facts and proceedings to the extent necessary for resolution of this case.

Banta is a tile installation corporation in Lancaster, Pennsylvania, where local tile workers are represented by Local 5. Banta and Local 5 previously had been parties to a succession of collective bargaining agreements, but Banta terminated its contract with Local 5 in April 2006. Local 5 remained a party to a similar contract with other employers in the area.

Banta was also a signatory to two collective bargaining agreements between International Union of Bricklayers and Allied Craftworkers, Local Union No. 1 ("Local 1"), a Philadelphia-area group, and the Associated Tile Contractors of Philadelphia and Suburbs ("the Association"). Banta was not a member of the Association, but signed the agreements as an independent signatory employer in 1997. Both of these agreements contained the following "me too" and "evergreen" language:

This Agreement shall remain in full force and effect through April 30, 1998 and shall continue thereafter unless there has been given not less than 90 days written notice ..., by either party hereto, of the desire to modify and amend this Agreement through negotiations. In the absence of such notice, *the employer and the union agree to be bound by the area-wide negotiated contracts with the [Association] and extending this Agreement for the life of the newly-negotiated contract.*

(emphasis added). At no time did either Banta or Local 1 express a desire to modify or amend the agreements.

In 2004, the Association and Local 1 negotiated a successor agreement. The successor agreement contained a "traveling contractors" clause, which required employers to comply with the terms of any other Bricklayers Local Union standard agreement when employers sent union members outside the Philadelphia area to work. Local 5 is a party to one standard collective bargaining agreement with all employers within its jurisdiction. This standard agreement is in effect from May 2006 until April 2010. Banta was not a signatory to the 2004 agreement.

In May 2006, Local 5 discovered that Banta had employees in the Lancaster area, but was not in compliance with the terms of the standard collective bargaining agreement. In August 2006, Local 5 filed a grievance asserting that Banta had violated the "traveling contractors" provision, contained within the Local 1 agreement. The matter was submitted to arbitration, and the arbitrator ruled in Local 5's favor. Local 5 then filed a complaint in the District Court, seeking to enforce the arbitration award. Both Local 5 and Banta filed motions for summary judgment.

---

1. The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291.

The only issue in the District Court, and on appeal, is Banta's argument that the case was improperly submitted to arbitration.[2] Specifically, Banta argued that Local 5 brought the case before the arbitrator by invoking the terms of Local 5's standard collective bargaining agreement. Banta argued that it was not a signatory to that contract because it terminated its agreement with Local 5 in 2006.

The District Court concluded that because the agreement between Banta and Local 1 intended to confer benefits on third parties such as Local 5 (via the "traveling contractors" clause), Local 5 could invoke the arbitration clause. As a result, the District Court granted summary judgment to Local 5. Banta appeals, arguing that the District Court erred when it held that this dispute was arbitrable.[3]

## II. Discussion

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). When determining whether a dispute is arbitrable, a court must analyze two issues: (1) whether the parties have entered into a written agreement to arbitrate, and (2) whether the dispute in question falls within the scope of that agreement. *Nationwide Mut. Ins. Co. v. Cosenza*, 258 F.3d 197, 202 (3d Cir. 2001). When confronting questions of arbitrability, a court should "independently review the agreement" and "should not give deference to the arbitrator's decision . . ., but should exercise plenary review to determine whether the matter is arbitra-

ble." *McKinstry Co. v. Sheet Metal Workers' Int'l Ass'n, Local Union No. 16*, 859 F.2d 1382, 1385 (9th Cir.1988) (citing *AT & T, Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). "However, where one of the parties seeking arbitration is not a signatory to the underlying agreement, a further step is added to the inquiry. Before the presumption of arbitrability can apply, the non-signatory party must show that the signatories intended it to derive benefits from the agreement." *Id.* at 1384. "Where such intent can be shown, and where the arbitration clause is susceptible to the interpretation that the non-signatory has the right to enforce these benefits, then arbitration is proper." *Id.* at 1384–85.

### 1. "Me Too" Clauses

"Me too" clauses of the type in the agreement between Banta and Local 1 are common and generally enforceable. The Ninth Circuit has defined "me too" clauses as

allow[ing] independent, usually smaller, employers to obtain all the benefits of the master [collective bargaining agreement] that is negotiated by the principal employers in the industry without having to participate in the industry negotiations, or to engage in separate negotiations, every few years. Thus, the independent employer is assured that (1) it will not be subject to a contract containing more onerous conditions than are applicable to its competitors, (2) it will obtain whatever protections or advantages the industry collective bargaining agreement provides other em-

---

2. Banta raised several affirmative defenses in the District Court, but the District Court correctly found that because Banta failed to move to vacate or modify the arbitration award within thirty days, the statute of limitations period had run.

3. We exercise plenary review over a district court's summary judgment ruling. *Twp. of Piscataway v. Duke Energy*, 488 F.3d 203, 208 (3d Cir.2007).

ployers, (3) it will be saved the cost of expensive negotiations, and most pertinent here, (4) it will be covered by an agreement whenever the rest of the industry is covered and not subject to an agreement whenever the rest of the industry is not.

*Arizona Laborers, Teamsters, and Cement Masons Local 395 v. Conquer Cartage Co.,* 753 F.2d 1512, 1518–19 (9th Cir.1985).

In *Berwind Corp. v. Comm'r of Soc. Sec.,* 307 F.3d 222 (3d Cir.2002), this Court held that "a 'me too' agreement is an agreement whereby an employer who is not a member of [a trade association] agrees with a union to be bound by the terms of a [national wage agreement]." *Id.* at 237 n. 18. Further, the Court noted that "a 'me too' agreement has terms identical to the terms of [a national wage agreement] and there is no distinction regarding an employer's contractual rights and obligations. Thus, the distinction between a ... signatory [to the national wage agreement] and a 'me too' signatory is without a difference." *Id.*; *see also Shenango, Inc. v. Apfel,* 307 F.3d 174, 188 n. 9 (3d Cir.2002) (holding same). This interpretation of "me too" clauses is in line with decisions from other courts of appeal. *See, e.g., N.L.R.B. v. Boston Dist. Council of Carpenters,* 80 F.3d 662, 664 (1st Cir. 1996) (A "[u]nion exercises the collective bargaining authority of its constituent locals in negotiating a ... Master Agreement ("MA") with several multi-employer associations. Once a MA has been negotiated with these ... associations, the Union customarily offers the same MA to other area employers, including those which neither belong to a[n] ... association nor otherwise participate in negotiations. These nonparticipating employers may bind themselves to the negotiated MA simply by executing what are known as "me too" acceptances ...."); *Davon, Inc. v. Shalala,* 75 F.3d 1114, 1117 (7th Cir.1996)

(interpreting "me too" clause in the same manner).

■ Banta argues that the "me too" provisions of the contracts it signed in 1997 were only meant to extend the existing terms of the 1997 Agreements for the duration of any subsequently negotiated area wide contract. In other words, Banta would have us read the provisions as nothing more than "evergreen" clauses by which the existing contract could be renewed indefinitely. However, Banta ignores the crucial "me too" language by which it "agree[d] to be bound by the area wide negotiated contracts with the" Association. Under any fair reading of this language, Banta agreed to be bound by the *terms* of subsequent area wide contracts between Local 1 and the Association, not just the *duration* of such contracts.

Here, Banta is a smaller employer which benefited from obtaining all the benefits attendant to the master collective bargaining agreement via the "me too" clause without having to itself engage in collective bargaining. The "me too" clause protected Banta by ensuring that its contracts were in line with, and were not more onerous, than its competitors' contracts. Although Banta signed the agreements with the "me too" provision, presumably to avail itself of the benefits of the clause, it now wants to distance itself from the clause by arguing that it never agreed to incorporate the "traveling contractors" clause, discussed below.

The District Court was correct when it held that, by signing the collective bargaining agreement that contained the "me too" clause with Local 1 in 1997, and never modifying, amending, or terminating that agreement, Banta agreed, under widely accepted law governing collective bargaining agreements, to be bound by any successor master agreement negotiated by the Association and Local 1. Given the unambigu-

ous language in the 1997 contracts, and settled law recognizing the enforceability of "me too" clauses, we cannot accept Banta's argument that it meant to only be bound in perpetuity to the terms of the 1997 collective bargaining agreements as they existed at that time.

### 2. "Traveling Contractors" Clauses

■ "Traveling contractors" clauses, such as the one contained in the agreement between the Association and Local 1 in this case, are common in the construction industry. *See, e.g., McKinstry*, 859 F.2d at 1389 ("We note that the position asserted by Local 16 in the underlying dispute is not alien or new to construction industry contracts. Collective bargaining patterns in the construction industry typically share the same overall pattern as that used to arrive at the agreement in this case: a standard form agreement or master agreement is reached by bargaining representatives at the national level, with modifications-typically having to do with wage schedules-made between local unions and regional contractors' associations."). Although there is no case law in this Circuit to guide the analysis regarding the "traveling contractors" clause, there is persuasive case law from other Circuits that supports the District Court's decision to allow Local 5 to arbitrate their grievance against Banta.

In *McKinstry*, the Ninth Circuit held that a "traveling contractors" clause, similar to the one at issue in this case, "was clearly intended to extend certain direct and indirect benefits to workers other than those represented by [the local union which was the signatory]." *Id.* at 1386. Accordingly, the Ninth Circuit held that a sister, non-signatory union, such as Local 5 in this case, could bring a grievance against the employer that had operated outside the area governed by the agreement. *Id.* Likewise, the Eighth Circuit held that identical language in an agreement extended benefits to workers other than those represented by the signatory local union. *Local Union No. 36 Sheet Metal Workers' Int'l Assoc. v. Atlas Air Conditioning*, 926 F.2d 770, 772–73 (8th Cir.1991). *See also Flynn v. Corp.*, 481 F.3d 824, 830–31 (D.C.Cir.2007) (holding that, in light of the "broad understanding" of traveling contractors clauses, the clause in the contract at issue bound the defendant company to the collective bargaining agreement in force at a foreign jobsite even though that company was not a signatory to the foreign agreement).

The "traveling contractors" language at issue in this case is as follows:

When the employer has any work of the type covered by this Agreement to be performed outside of the area covered by the Agreement and within the area covered by a standard Collective Bargaining Agreement of another affiliate of the International Union of Bricklayers and Allied Craftworkers, the Employer agrees to abide by the full terms and conditions of the standard Agreement in effect on the job site area with respect to all employees, wherever hired, who perform such work, except as provided in the next sentence of the paragraph.

Employees, covered by this Agreement who are sent to projects outside of the area covered by this Agreement shall be paid at least the established minimum wage scale required under this Agreement but in no less than the established minimum wage scale of the local Agreement covering the territory in which such work is being performed plus all contributions specified in the job site local Agreement.

As noted above, the relevant inquiry when deciding if a non-signatory to this agreement can invoke the arbitration clause is whether the non-signatory party,

here Local 5, can show that the signatories intended it to derive benefits from the agreement. Local 5 has met this burden by showing that the agreement was clearly intended to convey benefits to unions besides those who were represented by the union which signed the agreement.

Banta's main argument is that while the "traveling contractors" clause may, in general, be meant to benefit non-signatories like Local 5, Banta itself never intended to acquiesce to that clause in the Agreement between the Association and Local 1, therefore it could not have intended to benefit non-signatories like Local 5. This argument does not gel with the law governing "me too" and "evergreen" clauses in collective bargaining contracts. Banta agreed to be bound to the collective bargaining agreements negotiated by Local 1 and the Association, in addition to future amendments of that Agreement via the "me too" clause, unless and until Banta said otherwise. Banta never said otherwise, including after Local 1 and the Association added the "traveling contractors" clause in a successor agreement. Therefore, Banta cannot now say that it never meant for the "traveling contractors" clause, later added to the Agreement, to benefit others. By signing and never amending the "me too" clause, Banta is bound.

### III. Conclusion

For the foregoing reasons, we will affirm the District Court's grant of summary judgment in favor of Local 5.